**Gaylon George WALBEY, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 71963.

Court of Criminal Appeals of Texas.

June 26, 1996.

Stephen C. Taylor, Galveston, for appellant.

Denise V. Wilkerson, Asst. Dist. Atty., Galveston, Matthew Paul, State's Atty., Austin, for State.

## OPINION

MALONEY, Judge.

Appellant, Gaylon George Walbey, Jr., was convicted in July of 1994, of a capital murder committed in May of 1993. TEX. PENAL CODE ANN. § 19.03(a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure art. 37.071 §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Tex.Code Crim. Proc. Ann. art. 37.071 § 2(g). Direct appeal is automatic. Tex.Code Crim. Proc. Ann. art. 37.071 § 2(h).

Appellant raises five points of error, including challenges to the sufficiency of the evidence at both stages of trial. A recitation of the facts is necessary. Looking at the evidence in the light most favorable to the jury's verdict, the record reveals the following facts: On May 4, 1993, the victim and Maria Eliaz, both instructors at Galveston College, spent the day together preparing for the end of the semester. At about 4:50 p.m., the victim left the campus to drive to her home three blocks away, intending to return before 6:00 p.m. for a class. When she arrived at home, she parked her vehicle in front of her house and waved to a neighbor. She entered her home through the back door. A neighbor boy heard the door slam shut, a man yell "shut up" many times, and muffled screaming and banging. Another witness saw a young black male driving away from the victim's house in the victim's car about 7:10 that evening. The victim never returned to campus. At 6:45 p.m., Eliaz left campus and drove to the victim's residence. Not seeing the victim's "turquoise green" Ford Explorer, Eliaz assumed they had missed each other and she went home. When the victim did not appear at work the next morning to administer a final exam, a neighbor was called and asked to check on her. After the back door "just came open" to his touch, the neighbor entered the resi-

dence and discovered the victim's body. He summoned the police.

Officer J. Jennings arrived on the scene. He observed blood everywhere and evidence of a struggle. A barbecue fork and a butcher or carving knife protruded from the victim's back. Another knife handle, without the blade, lay by the victim's head. The victim was also noted to have an extension cord wrapped around her neck and little red flecks of what appeared to be paint were observed around her body. In the kitchen, Jennings found two large knives with bloody hand prints on the grip and what appeared to be blood and flesh on the blades. Jennings also found a red fire extinguisher that was missing paint and dented up, and appeared to have blood and hair on it. Shoe prints, palm prints, and fingerprints were embedded in the dust on top of the refrigerator. Jennings further noticed that the hallway overhead light upstairs did not have a light bulb in it. The missing bulb was found in a potted plant on the floor nearby. Next to the plant, the officer discovered a balled-up bloody shirt. Jennings found blood smears on the bathroom door and a pinkish stain in the sink as if blood had been washed down it. In the victim's bedroom, one of the windows had been broken and pieces of the broken glass were stacked in a neat pile against the house on the roof outside. Finally, Jennings noted that the air conditioner was off with no extension cord attached with which to run it. An extension cord capable of running an air conditioner was found downstairs.

Fingerprints on at least one of the knives, the barbecue fork, and the fire extinguisher were later identified as appellant's, as were fingerprints recovered from the broken window in the bedroom, the air conditioner shroud, the top of a CD storage box, a piggy bank, the hall telephone, and the refrigerator. Also, Jennings found evidence that a mask had been cut from a sheet. Further investigation revealed that appellant either waited some time for the victim to return home or lingered a while after the murder, as evidenced by the fact that he smoked at least three cigarettes down to the butt during the time he was in the residence. Appellant was apprehended driving the victim's vehicle. Appellant eventually confessed to the crime.

Additional investigation revealed that appellant bonded one Robert Schreiber out of jail at approximately 10:00 p.m. on May 4, 1993. Schreiber and appellant drove away from the jail in a Ford Explorer. Schreiber testified that the two of them drove around until daylight. Among places they visited, according to Schreiber, was appellant's "mother's" house in Galveston.[1] Schreiber told the jury that appellant entered the residence through the back door and returned to the vehicle with a stereo, VCR, cable box, and a radio/CD player. After pawning one of the items, appellant and Schreiber returned to the house and appellant retrieved a television and another VCR.

Testimony from a neighbor indicated that appellant had been "lurking" around the victim's backyard within weeks before the offense.

The medical examiner testified that the victim died as a result of massive trauma to the head—probably a combination of a concussion and contusions to the brain and bleeding from massive scalp lacerations. He also observed small flecks of red paint in and under the victim's skin and in her hair. The examiner further noted that the victim had a large cut to the back of the neck, stab wounds to the ears, numerous stab wounds to her back, and bruises and abrasions to her upper back, neck, and hands. One stab wound to the victim's back penetrated the bone to the extent that the knife blade could not be pulled out. A second stab wound to the back went through to the lung. Because of the lack of bleeding around the stab wounds, the medical examiner concluded that the victim was probably dead when she received the stab wounds to her back. He further testified that the victim suffered for at least ten to fifteen minutes as she was beaten about the head and shoulders with the fire extinguisher.

1. Through photographs, Schreiber identified the residence he and appellant went to as the victim's home.

At the punishment phase of trial, the State presented evidence that appellant had acquired a bad reputation by the time he was ten years old. At fourteen, appellant was arrested after fleeing from police at 4:00 a.m., and was found in possession of an illegal butterfly knife and an ice pick. Appellant was a runaway from a Galveston youth center at the time. On April 2, 1993, appellant was arrested in the middle of the night after fleeing from officers in an area that had suffered a recent rash of burglaries. At the time of that arrest, appellant was carrying large bolt cutters and lied to the arresting officer about where he lived. On April 25, 1993, less than two weeks before the instant offense, appellant was caught in a stolen car which contained several items not belonging to the owner, including a pellet gun and burglary tools. The State put on further evidence that appellant would not conform to rules and was not helped by counseling efforts. Evidence was also presented that appellant left his placement at a Houston foster home because he did not like the rules.

One psychologist who testified for appellant admitted that appellant had a possible anti-social personality disorder diagnosis. He noted that appellant's records revealed a history of truancy, lying, stealing, burglary, and vandalism. The expert further testified that a person diagnosed with antisocial personality disorder is more likely to commit future crimes,[2] including burglaries, and if surprised during such a burglary would probably again commit the same sort of brutal murder.

■ Appellant's third point of error states: The evidence adduced at trial was legally insufficient to sustain appellant's conviction for capital murder, in that the indictment alleged that appellant intentionally caused the death of [the victim] by striking and hitting [the victim] with a deadly weapon, to-wit: a fire extinguisher, when a fire extinguisher is not a deadly weapon per se,

and the jury was precluded from answering the special issue as to whether a fire extinguisher was a deadly weapon.

Appellant contends the evidence is insufficient because the jury did not make a stated finding as to the use of a deadly weapon and a fire extinguisher is not a deadly weapon per se.

An "affirmative finding" of the use or exhibition of a deadly weapon is only required under Tex.Code Crim. Proc. Ann. art. 42.12 § 3(g), concerning probation, and Tex.Code Crim. Proc. Ann. art. 42.18 § 8(b)(3), concerning parole. These provisions expressly do *not* apply to capital cases. Appellant attempts to apply non-capital caselaw to a capital case.[3] Point of error number three is overruled.

■ In his fifth point of error, appellant posits that the evidence was insufficient to support the jury's affirmative answer to the issue on whether appellant would be a continuing danger. Tex.Code Crim. Proc. Ann. art. 37.071 § 2(b)(1). In reviewing whether the evidence is sufficient to support the jury's affirmative finding on the issue of future dangerousness, this Court looks at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Allridge v. State*, 850 S.W.2d 471 (Tex.Crim.App.1991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). The facts of the crime alone can be sufficient to support the affirmative finding to the special issue. *Allridge, supra*. The circumstances of the crime may provide greater probative evidence of a defendant's probability for committing future acts of violence than any other factor relevant to the second special issue. *Id.*

**2.** The expert would not commit to whether appellant might commit future *dangerous* crimes.

**3.** The evidence indicates that the victim died as a result of blunt trauma to the head and there were red flecks of paint in and around the victim's scalp consistent with the paint from the fire

extinguisher. A rational juror could have found that the victim died from being beaten about the head with the fire extinguisher, a "deadly weapon," as that term was defined in the jury charge. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ At trial, the jury is permitted to look at several factors in its review of future dangerousness including, but not limited to:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the offense;

7. psychiatric evidence; and

8. character evidence.

*Barnes v. State*, 876 S.W.2d 316, 322 (Tex. Crim.App.), *cert. denied*, —— U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Crim.App. 1987). These factors are also helpful in this Court's evaluation of this question.

Evidence was presented showing the calculated nature of appellant's acts and the forethought, deliberateness, and premeditation with which he executed his plan. Evidence revealed that appellant knew the layout of the victim's house and was familiar with her habits, having previously lived with her.[4] Appellant had also been seen "lurking" around the house in the weeks prior to the offense. He carefully and methodically broke into the home, removed the light bulb from the upstairs hallway ostensibly to make it darker, took at least one extension cord downstairs and cut something like a mask out of a sheet. It appears that appellant at least tried crouching on top of the refrigerator as a potential plan of attack. The victim's screams were heard almost immediately upon her entry into the house. A rational jury could have viewed this as evidence of a planned attack.

The murder was brutal. After beating the victim with a fire extinguisher to the point

that she was lying face down and probably unable to move, appellant attempted strangulation. Thereafter, appellant stabbed the victim with a barbecue fork and three to four different kitchen or butcher knives, embedding one so deeply into the bone that the handle broke off and the blade could not be removed. Appellant then spent the better part of an hour going through the victim's purse and washing up before driving off in the victim's car. He bragged about his new vehicle to his friend, driving around in it all night. He returned to the scene on two more occasions, certain that his deed was yet undiscovered, and proceeded to steal more items from the household.

Although the State did not present any evidence of prior convictions, it showed that appellant had acquired a bad reputation by the time he was a young boy. As a juvenile, appellant ran away from foster homes and his grandmother's house on a regular basis. The police had found appellant in possession of illegal weapons on at least one occasion and in possession of burglary tools a number of times. The evidence also revealed that appellant had a history of truancy, lying, stealing, and burglary. Appellant's own psychologist conceded that appellant exhibited many of the characteristics of a person diagnosed with anti-social personality disorder and noted that a person diagnosed with this disorder typically lacked a social conscience.

Viewing the totality of the evidence, we hold that a rational trier of fact could have concluded beyond a reasonable doubt that appellant would probably commit criminal acts of violence that would constitute a continuing threat to society. *See Martinez v. State*, 924 S.W.2d 693 (Tex.Crim.App.1996); *Harris v. State*, 738 S.W.2d 207 (Tex.Crim. App.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987). Point of error five is overruled.

■ In his first point of error appellant claims the trial court erred in refusing to suppress his confessions. In his related second point of error, appellant avers that the trial court erred in refusing to suppress oth-

---

4. When appellant was fourteen, the victim served as his foster mother for about four months, and

he lived with her again for a couple of weeks in early 1993.

er evidence consisting of items found on appellant's person and in the victim's vehicle after appellant's arrest. Appellant essentially argues that the evidence and statements were admitted in violation of the Fourteenth Amendment to the United States Constitution because they were the fruit of an illegal arrest.

According to appellant, on the day following the instant offense, Sergeant Brian Riedel received information on an "attempt to locate" a Ford Explorer with license plate "JSS52C." Appellant states that Riedel "had no information as to whether the vehicle had been reported stolen." While off-duty, Riedel spotted the described vehicle, called for and was soon joined by a backup officer. After observing appellant drive into a carwash, the two officers approached with weapons drawn and arrested him. While appellant concedes that he was read his *Miranda*[5] rights, he contends the officers did not have probable cause to arrest him and that he was never informed of the reason for the arrest.

Appellant misrepresents one critical fact surrounding his arrest: Riedel testified he had received information that the Ford Explorer *had been reported stolen from the scene of a homicide.* Further, when he saw the vehicle, Reidel called the police department to verify the license plate number as matching the number of the reportedly stolen vehicle. We stated in *Delk v. State,* 855 S.W.2d 700, 711 (Tex.Crim.App.), *cert. denied,* 510 U.S. 982, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993), that when a vehicle is known to be stolen and its owner is a murder victim, officers have sufficient probable cause to arrest the person who has taken possession of the vehicle not only for auto theft, but also for suspicion of murder. Riedel testified at trial that appellant was arrested, at the very least, for unauthorized use of a vehicle because the vehicle was reported stolen from the scene of a homicide. Cazales, the second officer on the scene, testified that he told appellant that he was being detained because

the vehicle he was driving had disappeared from the scene of a homicide. Hence, the officers had sufficient probable cause to arrest appellant in the instant case.[6]

Because appellant was properly arrested, the victim's driver's license found on appellant's person was properly admitted at trial as having been seized in a search incident to arrest. *See Delk,* 855 S.W.2d at 712. Moreover, with regard to "any and all items recovered from . . . the Ford Explorer," appellant has no standing to contest seizure of items from a stolen vehicle. *Hughes v. State,* 897 S.W.2d 285, 305 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1967, 131 L.Ed.2d 857 (1995).

 Finally, appellant complains that his confessions were also the result of the illegal arrest and resulted from coercion. Since appellant's arrest was based upon probable cause, as discussed above, his contention that his confessions were the fruit of an illegal arrest is without merit. As to appellant's complaint that his confessions were not voluntary, he claims that he "was coerced" by being told that it "would be in [his] best interest to go ahead and cooperate with [the officers] and do what they told [him] to do," and further alleges that the officers suggested to him what he should say in his statement. The record reflects that every officer involved with appellant's arrest, processing, or taking of his confessions testified that they did not coerce or threaten appellant in any way, nor did they promise him anything in return for cooperating. The record further shows that appellant was read his *Miranda* rights and indicated his understanding of them on at least three occasions prior to making his written confession and on at least four occasions prior to making his oral confessions. Appellant was allowed to smoke cigarettes and the interviewing officer was instructed to provide him with food and other amenities. An officer present during appellant's confessions testified that appellant was

---

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. No warrant was required as appellant contends because the officers had probable cause to believe that an Unauthorized Use of a Vehicle was

being committed within their view. *See* Tex. Code Crim. Proc. Ann. art. 14.01(b) and Tex. Penal Code § 31.07; *see also* Tex.Code Crim. Proc. Ann. art. 14.04 (officers' authority to arrest when offender is about to escape).

never told what to say in his statements. The record supports the trial court's denial of appellant's motion. Points of error one and two are overruled.

■ In his fourth point of error, appellant claims the trial court erred when it instructed the jury that a defendant convicted of capital murder and sentenced to life imprisonment would serve a minimum of thirty-five (35) calendar years before becoming eligible for parole. *See* Tex.Crim. Proc.Code Ann. art. 42.18, § 8(b)(2).[7] Notwithstanding the fact that appellant himself requested the instruction, appellant complains that inclusion of such an instruction violates Texas Constitution, Article IV, § 11, and, thus, results in reversible error. The instruction about which appellant complains is as follows:

> You are instructed that under the law applicable in this case, the Defendant, if sentenced to life imprisonment, might have his life sentence reduced by the award of parole, however, if the Defendant is sentenced to a term of life, he will not become eligible for parole for thirty-five (35) years which would be in the year 2028. Eligibility for parole does not guarantee that parole will be granted. You may consider the existence of the parole law.

Article IV, § 11, of the Texas Constitution was amended by the voters of the state in 1989, to provide in pertinent part that:

> The Legislature shall have authority to enact ... laws that require or permit courts to inform juries about the effect of good conduct time and eligibility for parole[.]

Concurrent with that amendment's effective date, the Legislature amended article 37.07 to permit jury instructions on parole laws at punishment in noncapital cases. Tex.Code Crim. Proc. Ann. art. 37.07 § 4. Article 37.071, which governs sentencing in capital cases, remains silent on the issue. We have, rightly or wrongly, interpreted Article IV,

§ 11, as prohibiting, in the absence of legislative action, jury instructions regarding parole law in capital cases. *Elliott v. State,* 858 S.W.2d 478, 489 n. 7 (Tex.Crim.App.1993)(Texas Constitution prohibits instruction as to parole laws in capital cases); *see also Smith v. State,* 898 S.W.2d 838, 849 (Tex.Crim.App.1995)(plurality)("Texas Constitution prohibits, without legislative action, the jury to consider parole when considering whether a capital defendant should be sentenced to life or death").

While we have interpreted article IV, § 11, as prohibiting parole instruction in capital cases absent legislative action, we reach that conclusion only by reference to the Code of Criminal Procedure. Article IV, § 11 does not contain such prohibition on its face; neither does article 37.071, which governs sentencing in capital cases.[8] In the absence of an express constitutional or statutory prohibition, we do not view a jury instruction as to parole laws in capital cases as error which is nonwaivable. *Compare Powell v. State,* 897 S.W.2d 307 (Tex.Crim.App.1994)(legislatively mandated effective date of statute is absolute systemic feature not subject to waiver), *cert. denied,* —— U.S. ——, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); *Stine v. State,* 908 S.W.2d 429 (Tex.Crim.App.1995) (plurality)(constitutional provision requiring judge to conduct proceedings in county seat where case pending is mandatory and nonwaivable); *Ex parte Hernandez,* 906 S.W.2d 931 (Tex.Crim.App.1995)(constitutional provision that "jury shall be composed of twelve men" is nonwaivable) *with Batiste v. State,* 888 S.W.2d 9, 16 n. 5 (Tex.Crim.App.1994)(*Batson* error waived); *Harris v. State,* 827 S.W.2d 949 (Tex.Crim.App.)(violation of Fifth Amendment waived), *cert. denied,* 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992); *Briggs v. State,* 789 S.W.2d 918, 924 (Tex.Crim.App.1990)(defendant waived alleged violation of rights to confrontation and

---

7. Article 42.18 § 8(b)(2) states:
 If a prisoner is serving a life sentence for a capital felony, the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years.

8. For these reasons, we believe any language prohibiting such instruction was overbroad. Texas trial judges have the discretion to instruct capital juries on the issue of parole and may find such instruction an effective means of charging the jury on the law applicable to the case. *See generally* Tex.Code Crim. Proc. Ann. art. 36.14.

due process by failing to object at trial).[9] Accordingly, by requesting the now-complained of instruction on parole laws, appellant waived error. *See Tucker v. State,* 771 S.W.2d 523, 534 (Tex.Crim.App.1988), *cert. denied,* 492 U.S. 912, 109 S.Ct. 3230, 106 L.Ed.2d 578 (1989); *Livingston v. State,* 739 S.W.2d 311, 341 (Tex.Crim.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). Point of error four is overruled.

The judgment of the trial court is affirmed.

CLINTON, J., concurs in the result.

---

**9.** In *Powell,* the defendant requested a jury instruction at punishment in his capital murder trial which excluded a special issue that should have been submitted and included a new special issue, in accordance with the new death penalty statute, not in effect for that defendant's case. The State argued the defendant could not complain of the instruction on appeal since he had requested it, citing *Livingston v. State,* 739 S.W.2d 311, 341 (Tex.Crim.App.1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). In *Livingston,* the defendant requested, in addition to the mandatory special issues, submission of the third "provocation" issue, mandatory only where there is evidence of provocation by the victim. We held the defendant could not complain on appeal about submission of the third issue:

> Error, if any, was invited by and was to the benefit of appellant. It is a long-standing rule that a defendant may not request a charge and when that charge is given as requested, complain on appeal of any error.

*Livingston,* 739 S.W.2d at 341. We said *Livingston* was distinguishable from the facts in *Powell* because "*Livingston* dealt with inclusion of a gratuitous special issue, not the exclusion of a statutorily required issue." *Powell,* 897 S.W.2d at 315–16. Appellant's requested instruction, like the defendant's in *Livingston,* did not *exclude* a constitutionally mandated issue from jury consideration. Rather, appellant received a gratuitous instruction.