George H. WHITAKER, III, Appellant,

v.

The STATE of Texas.

No. 72371.

Court of Criminal Appeals of Texas,
En Banc.

May 20, 1998.

Rehearing Denied July 15, 1998.

Pamela B. Williams, Houston, for appellant.

Julie Klibert, Assistant District Attorney, Houston, Matthew Paul, Austin, for State.

## OPINION

McCORMICK, Presiding Judge, delivered the opinion of the Court in which MEYERS, KELLER and HOLLAND, Judges, joined.

Appellant was convicted in April 1996 of capital murder. V.T.C.A., Penal Code, Section 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge sentenced appellant to death. Article 37.071, Section 2(g).[1] Direct appeal to this Court is automatic. Article 37.071, Section 2(h). Appellant raises nine points of error. We will affirm.

In points of error three and seven, appellant argues that the evidence is legally and factually insufficient to support the jury's findings that he committed the underlying offense of burglary and that he entered the house with the intent to commit murder.

Viewed in the light most favorable to the verdict, the evidence at trial established the following: Catina Carrier, the deceased's sis-ter, met appellant in high school and became friends with him sometime after graduation. The two eventually began dating in September 1993, moved in together, and became engaged that Christmas. After moving in with appellant, he became very controlling and possessive of Catina and did not want her to be around her family members or away from their home when she was not working. Also, appellant often showed up at her workplace and often took the money she was making. Catina testified that appellant bought a white Suburban with the money he had taken from her. Catina testified appellant became increasingly abusive and told her if she ever left him no one else would have her.

In April 1994, Catina decided to leave appellant. She first moved her daughter, who had been living with them periodically, out of the house. She then made secret arrangements in order to get herself out too, consequently, forcing her to leave all her belongings in appellant's home. On the day she left, Catina had appellant drop her off at work as usual. She then had a co-worker from another job come pick her up and drop her off at a friend's house where she only stayed one night. The next day, she moved on to a friend's house that appellant did not know. Catina did not let her family know where she was staying so as not to involve them in her troubles. Catina further did not work for fear appellant would find her. Appellant did try to locate Catina during this time through her family and friends.

Around June 14, 1994, appellant told a friend, Laquisia Carter, that "after Wednesday, she wouldn't see him anymore." He told her he "was going to kill somebody." Laquisia asked who, but appellant would not say. She assumed appellant was joking.

On Wednesday, June 15th, appellant went to the EZ Pawn Shop and picked up his .45–caliber pistol that he had pawned for a short-term loan on an earlier occasion. Driving his white Suburban and wearing a white shirt[2] and black slacks, appellant then went and

---

1. Unless otherwise indicated all future references to Articles refer to Code of Criminal Procedure.

2. There is conflicting testimony regarding whether this was a plain white dress shirt or a doctor's lab coat.

picked up his wife,[3] Rosemary Whitaker,[4] from whom he was separated, their two small daughters, and Rosemary's nine-year old son. Eventually, the group picked up Donald Carter ("Junior"), whom appellant had earlier asked to take a ride with him. Junior did not know where they were going, but Rosemary had been informed that they were going to take Catina's belongings back to her. Rosemary believed she was brought along to prevent anything from happening if a fight broke out.

On the way to Catina's parents' home in Crosby, appellant drove through the Kroger parking lot where Catina's father works. Then, at some point about halfway to Crosby, appellant pulled over and asked Rosemary to drive. Appellant and Junior got in the back seat and, after driving a little farther, appellant showed Junior the .45–caliber pistol and said "this is the gun I told you about." Junior did not think much of this because appellant had told Junior about a week before that he had bought a gun. Appellant then put the gun away and they kept riding.

Closer to their destination, appellant had Rosemary exit and pull into a gas station with a pay phone. As appellant exited the vehicle, he asked Junior to come with him. Upon reaching the phone, appellant dialed it and then handed the receiver to Junior and told him to ask for "Kiki." Junior complied and the person on the phone said, "just a minute." Junior then handed the phone back to appellant who listened for a second or two and then hung up without saying anything. The two returned to the Suburban and continued driving to the Carrier residence.

Meanwhile, on this same day, the Carrier family began their day as usual. Donald Carrier, Catina's father, went to work at Kroger's as he had done for many years. Catina's mother, Mary Carrier, stayed at home with Catina's sisters, five-year old Ashley and sixteen-year old Shakeitha ("Kiki").

Catina's ten-year old brother had gone to a friend's house to play. At about 3:00 p.m., Mary and Ashley were watching television when the phone rang. Mary answered the phone and the man on the phone asked for Kiki. Mary told him to hold on for a minute and she called for Kiki who was upstairs getting ready to go to work. Kiki said she had it so Mary hung up.

About fifteen to twenty minutes later, someone began knocking on the door. Mary and Ashley went to the door to discover appellant with Catina's tote bag, some toys and baby things. Mary told appellant she was surprised to see him because he had not called to say he was coming over.[5] Appellant indicated he would like to come inside, but Mary told him to just set the things outside the door and she would get them. Mary testified that she did not allow anyone into the house without her husband being there and she specifically did not feel comfortable about appellant.

Appellant went back to the Suburban and asked Junior to help him with the next load. Junior testified he observed Mary pull the first items into the house. On the way back to the door, appellant pulled out a gun and aimed it at Mary and Ashley. As Mary tried to shut the door, appellant forced his way into the house pushing the door. When this started, Junior dropped the clothes he was carrying and went back to the Suburban.

Once in the house, appellant stood about ten feet from Mary and Ashley pointing the gun at them. Mary begged appellant not to hurt her children and to "just leave." Mary then told Ashley to get out of there and run upstairs. As Mary continued to plead with appellant not to hurt her or the children and to explain that they had not done anything to him, appellant shot Mary in the shoulder. Appellant then ran upstairs. Mary heard Ashley screaming and Kiki holler, "[Appel-

3. The legal status of this marriage is the focal point of appellant's ninth point of error, *infra*.

4. *Rosemary is also referred to as "Rae" throughout the record.*

5. Appellant had called the month before to say he wanted to bring Catina's things over. At the

time, Mary told him that he could bring the items over and that her husband would be there to receive them. She further told him that she, Kiki, Ashley, and Don, her son, would not be there when he came over. Mary had not heard from appellant since.

lant], please don't hurt me." Then she heard a gunshot.

Mary, bleeding and in pain, ran outside to look for help. Neither Rosemary nor Junior would respond to her pleas and it appeared her closest neighbors were not home, so Mary ran around to the back of the house to see if she could rouse the people that lived behind her. As she was running around the corner of the house, Mary saw appellant come out of the house and go get something out of the back of the Suburban. She hoped appellant was leaving. She was mistaken.

Junior testified that when appellant came back out to the Suburban, appellant retrieved another bullet and loaded it into the weapon.[6] Appellant then ran behind the house and caught up with Mary. Mary again pleaded, "Please don't shoot me." Appellant, at only arm's length away, shot her again anyway. Mary fell to the ground and stayed there until she was sure appellant was gone. She then went back into the house to phone for help. When she reached her children, she found them sitting up next to each other against a wall in Kiki's room.

After leaving the Carrier residence, appellant and Rosemary drove Junior home and dropped him off. Appellant told Junior not to tell anyone about what happened. Rosemary also eventually went home with her children in the Suburban. Appellant was apprehended later that evening after attempting to flee from the police when they located him at his uncle's apartment drinking beer and watching television with another of his girlfriends, Selena Jackson, his uncle, and his uncle's lady friend.

Kiki died from a gunshot wound to the head. Ashley was revived after some effort and "life-flighted" to the hospital where she underwent extensive surgery for blunt head injuries. She retains some permanent neurological damage. Mary suffered two bullet wounds to the right shoulder area, has permanent nerve damage, and no use of her right hand.

In reviewing a legal sufficiency question, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Mason v. State,* 905 S.W.2d 570, 574 (Tex.Cr.App.1995), *cert. denied,* 116 S.Ct. 717, 133 L.Ed.2d 670 (1996). The jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony. *Barnes v. State,* 876 S.W.2d 316, 321 (Tex.Cr.App.), *cert. denied,* 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Likewise, reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Losada v. State,* 721 S.W.2d 305, 309 (Tex.Cr.App.1986).

In reviewing a factual sufficiency question, we view the evidence without the prism of "in the light most favorable to the prosecution," and we set aside the verdict only if it is "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Cr.App.1996); see also *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Cr.App.1997). A factual sufficiency review must be "appropriately deferential" to the jury's credibility and weight determinations. *Clewis,* 922 S.W.2d at 133.

Section 19.03(a)(2) states that "[a] person commits [a capital] offense if he commits murder [by intentionally or knowingly causing the death of an individual] in the course of committing or attempting to commit ... burglary...." A person commits burglary if, without the effective consent of the owner, he enters a habitation, or a building not then open to the public, with the intent to commit a felony or theft. V.T.C.A., Penal Code, Section 30.02(a)(1). An unlawful entry into a habitation with the intent to commit murder will satisfy the burglary element of a capital murder charge. *Boyd v.*

---

6. The evidence shows that appellant's gun was fully loaded upon entering the residence, but only a portion of the recovered bullets had actually been fired. The evidence further appears to show appellant was unaware his semi-automatic pistol would automatically chamber a new round. Therefore, appellant would pull the slide back, thereby ejecting live bullets throughout the home and prematurely emptying his pistol.

*State,* 811 S.W.2d 105, 114 (Tex.Cr.App.1991); *Fearance v. State,* 771 S.W.2d 486, 493 (Tex. Cr.App.1988).

In the instant case, appellant had arranged to retrieve his gun from the pawn shop on the day of the murder and brought the loaded pistol with him in order to presumably return clothes. Appellant then murdered the deceased, shot Mary Carrier twice, and beat Ashley Carrier in the head after pushing his way, without consent, into the Carrier residence at gunpoint. Further, appellant told a friend the day before that he "was going to kill somebody" on Wednesday.

We find a rational trier of fact could have found beyond a reasonable doubt that appellant committed the act of burglary and intended to commit murder upon entering the residence. And, the jury's findings on these issues are not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." Points of error three and seven are overruled.

In point of error two, appellant claims the evidence is legally and factually insufficient to support the jury's affirmative answer to the "future dangerousness" special issue. We do not review the factual sufficiency of the evidence to support the jury's answer to this special issue. See *McGinn v. State,* 961 S.W.2d 161 (Tex.Cr.App.1998).

We employ the *Jackson* standard in reviewing the legal sufficiency of the evidence to support the jury's answer to the "future dangerousness" special issue. See *Barnes v. State,* 876 S.W.2d at 322. In addition to the evidence of the facts of the offense, there was more evidence that appellant assaulted Catina during their relationship, that appellant assaulted Selena Jackson during their relationship, and that appellant kidnapped a friend of Catina's and threatened her with a butcher knife until she provided appellant with Catina's phone number when Catina was hiding from appellant. These prior threats and assaults when combined with the brutality of the instant offense support the jury's affirmative answer to the "future dangerousness" special issue. Point of error two is overruled.

In point of error one, appellant claims he "received ineffective assistance of counsel when his trial counsel failed to pursue mitigating evidence regarding the appellant's psychiatric history." He bases this contention on trial counsel's failure to have a psychiatric examination performed on appellant. The State claims the "record simply does not support appellant's assertion" because, for example, there "is nothing in the record to reflect that trial counsel did not have a mental health expert speak with appellant."

We agree. The record is not adequate to evaluate appellant's ineffective assistance of counsel claim on direct appeal. See *Ex parte Torres,* 943 S.W.2d 469, 475 (Tex.Cr.App. 1997); *Ex parte Duffy,* 607 S.W.2d 507, 513 (Tex.Cr.App.1980). Point of error one is overruled.

In points of error four and five, appellant claims the "failure of the courts to inform the jury that life imprisonment is equal to 40 years without parole" violates various provisions of the United States and Texas Constitutions. Appellant relies on the United States Supreme Court's fragmented decision in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (all opinions).

We have resolved appellant's claims adversely to him. See *Morris v. State,* 940 S.W.2d 610, 613 (Tex.Cr.App.1996), cert. denied, —— U.S. ——, 117 S.Ct. 2461, 138 L.Ed.2d 218 (1997); *Green v. State,* 934 S.W.2d 92, 105–06 (Tex.Cr.App.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997); *Broxton v. State,* 909 S.W.2d 912, 919 (Tex.Cr.App.1995); *Smith v. State,* 898 S.W.2d 838, 846 (Tex.Cr.App.), cert. denied, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995). Points of error four and five are overruled.

In point of error six, appellant claims the "capital murder scheme which gives individual discretion to jurors to determine whether mitigating evidence exist (sic) in a particular case so as to warrant life imprisonment as opposed to death is unconstitutional." We have resolved this claim adversely to appellant. See *Cockrell v. State,* 933 S.W.2d 73, 93–94 (Tex.Cr.App.1996), cert. denied, —— U.S. ——, 117 S.Ct. 1442, 137 L.Ed.2d 548

(1997); *McFarland v. State*, 928 S.W.2d 482, 520–21 (Tex.Cr.App.), cert. denied, — U.S. ——, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997). Point of error six is overruled.

In point of error eight, appellant claims the "trial court erred in denying the appellant's motion for mistrial evidence of extraneous offense before the jury not cured by an instruction to disregard." During guilt/innocence, Catina Carrier testified on direct by the prosecution that appellant was physically and mentally abusive towards her. Appellant objected, the trial court instructed the jury to disregard but denied appellant's request for a mistrial. On cross-examination by appellant, the same witness provided a nonresponsive answer that appellant beat her up before giving her an engagement ring. Appellant objected, the trial court instructed the jury to disregard but denied appellant's request for a mistrial.

Appellant complains on appeal that "the prejudice which resulted from this testimony in the case at bar was not cured by instructions to disregard" and that this evidence contributed to his death sentence. The State claims, among other things, any error was "waived" because the witness testified during punishment that appellant had threatened to kill her and that he had told her if she left him no on else would have her.

On this record, the instruction to disregard was sufficient to cure any error in the admission of the complained-of evidence during guilt/innocence. See *Cockrell*, 933 S.W.2d at 94–97 (Maloney, J., concurring). And, any uncured error at guilt/innocence was harmless as we do not perceive any danger the jury, having a reasonable doubt appellant committed the charged offense of capital murder, convicted appellant of capital murder based on the complained-of evidence. As to any error at punishment, we have held evidence of extraneous offenses are admissible at the punishment phase of a capital murder trial. See *Kemp v. State*, 846 S.W.2d 289, 307 (Tex.Cr.App.1992). Point of error eight is overruled.

Finally, in appellant's ninth point of error, he complains that the State's use of the allegedly-perjured testimony of Rosemary Whitaker was harmful to his character. He further claims the State illegally referred to Rosemary as appellant's wife during opening statements.

On direct examination by the State, Rosemary testified that she had been married to appellant for six years and had two children by him. No testimony was elicited by either the State or the defense regarding the legal status of this marriage. However, testimony was elicited stating that Rosemary and appellant were separated at the time of the offense, had not remained in the same residence, and that appellant had lived with at least two other women during the two years prior to this offense.

Appellant argues that under Section 1.91 of the Texas Family Code, a common-law marriage would not be legally recognized where the parties have lived separately and apart for at least two-years. Therefore, because Rosemary could no longer be considered his common-law wife, the jury was mislead. Further, he alleges the false representations affected the jurors' determination of mitigating evidence because the jury believed "he was guilty of the crime of adultery."[7] These arguments are without merit.

We first note that appellant has waived any possible error by failing to object to the State's characterization of Rosemary as appellant's wife. Texas Rule of Appellate Procedure 33.1(a). Second, appellant, on at least four occasions including closing arguments, also referred to Rosemary as his spouse. Therefore, the State did not err in also referring to her as such. Point of error nine is overruled.

The judgment of the trial court is affirmed.

MANSFIELD and PRICE, JJ., filed concurring opinions.

WOMACK, J., concurs in Point of Error No. 2, and otherwise joins the opinion of the Court.

BAIRD and OVERSTREET, JJ., filed concurring and dissenting opinions.

---

**7.** We note that "adultery" is not a criminal offense under the Texas Penal Code.

MANSFIELD, Judge, concurring.

I join the opinion of the Court but write separately with respect to appellant's fourth and fifth points of error. In *Smith v. State*, 898 S.W.2d 838, 846 (Tex.Crim.App.) (plurality op), *cert. denied*, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995), we held *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) was inapplicable to Texas. The major reason for our holding was that, unlike South Carolina, Texas' alternative to the death penalty in a capital case is not a life sentence without possibility of parole, but rather a life sentence with possibility of parole after serving forty calendar years. See Tex. Govt.Code § 508.145(b).[1]

It does seem somewhat incongruous that juries in noncapital cases are instructed as to applicable parole law whereas in capital cases juries are not to be so instructed. Depending on the life expectancy of an individual sentenced to life imprisonment upon conviction of capital murder, the forty calendar years he must serve before becoming eligible for parole may be, effectively, a life sentence without possibility of parole.

The Legislature has determined that the jury in a capital case is *not* to be charged as to the law relating to parole and/or good time. Given this clear expression of legislative intent, we are not free to substitute our own judgment on this matter, absent clear direction from the United States Supreme Court that we must do so. The Supreme Court denied *certiorari* in *Smith* and its progeny. See, e.g., *Green v. State*, 934 S.W.2d 92, 105–106 (Tex.Crim.App.1996), *cert. denied*, — U.S. —, 117 S.Ct. 1561, 137 L.Ed.2d 707 (1997). Indeed, the discussion of Texas parole law in *Brown v. Texas*, — U.S. —, 118 S.Ct. 355, 139 L.Ed.2d 276 (1997), while interesting, demonstrates the Supreme Court is not, at this time, inclined to review our holding in *Smith* that *Simmons* is inapplicable to Texas.

It is the Legislature's role, not ours, to determine what, if anything, juries are to be told about the operation of Texas parole law.

PRICE, Judge, concurring.

In points of error four and five, appellant asserts that the trial court's failure to instruct the jury that life imprisonment is equal to 40 years without parole is a violation of the United States and Texas Constitutions. In the past, I have dissented to this court's refusal to recognize such a claim. *See Raby v. State*, 970 S.W.2d 1, 17 (Tex.Crim.App. 1998) (Overstreet, J., concurring and dissenting, joined by Price, J.). Recently, Justice Stevens, joined by three other justices of the United States Supreme Court, discussed the inequities in this State's death penalty procedure. *Brown v. Texas*, — U.S. —, — — —, 118 S.Ct. 355, 355–357, 139 L.Ed.2d 276 (1997) (Stevens, J., opinion respecting the denial of the petition of a writ of certiorari, joined by Souter, Ginsburg and Breyer, JJ.). In that opinion, he noted that while Texas law requires that in noncapital cases the jury be given an instruction explaining when the defendant will become eligible for parole, such an instruction in capital cases is prohibited. Thus, he reasoned that the absence of such an instruction in a capital case "unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose." *Id.* at —, 118 S.Ct. at 356. I agree.

Although Justice Steven's opinion is merely a comment on the court's denial of certiorari, rather than a decision on the merits, it is unquestionably an important criticism of our death penalty procedure and may well be indicative as to how the Supreme Court might resolve this issue in the future.[1] How-

1. In *Simmons*, the prosecutor also misled the jury into believing the defendant would eventually be set free should he receive a life sentence. This misrepresentation violated the defendant's due process rights.

1. Justice Stevens emphasized that "... the Court's action in denying certiorari does not constitute either a decision on the merits of the questions presented ... or an appraisal of their importance ... Moreover, ... the likelihood that the issue will be resolved correctly may increase if this Court allows other tribunals 'to serve as laboratories in which the issue receives further study before it is addressed by this Court.'" *Brown v. Texas*, — U.S. —, — — —, 118 S.Ct. 355, 356–357, 139 L.Ed.2d 276 (1997) (Stevens, J., opinion respecting the denial of the petition of a writ of certiorari, joined by Souter,

ever, despite my disagreement with my brethren on this issue, I am mindful that my views are in the minority. I am also aware of my responsibility to observe principles of the doctrine of *stare decisis*. *See Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 854–855, 112 S.Ct. 2791, 2808–2809, 120 L.Ed.2d 674 (1992). Therefore, until a majority of this court indicates a willingness to reconsider this issue, I will observe precedent. With these comments, I join the opinion of the court.

BAIRD, Judge, concurring and dissenting.

I agree that no error at the guilt phase of trial was sufficient to warrant reversal of appellant's conviction. However, for the following reasons, I would remand this case to the trial court for a new punishment hearing. Tex.Code Crim. Proc. Ann. art. 44.29(c).

Points of error four and five contend the trial judge erred in not informing the jury that a life sentence would have required imprisonment for a minimum of 40 years. The majority overrules these points on the basis of settled precedent. *Ante,* at 599; citing *Morris v. State,* 940 S.W.2d 610, 613 (Tex.Cr. App.1996); *Green v. State,* 934 S.W.2d 92, 105–06 (Tex.Cr.App.1996); *Broxton v. State,* 909 S.W.2d 912 (Tex.Cr.App.1995); and, *Smith v. State,* 898 S.W.2d 838 (Tex.Cr.App. 1995). Under our law, whether a capital defendant may bring truthful information regarding parole eligibility to the venire is discretionary with the trial judge. *Santellan v. State,* 939 S.W.2d 155, 171 (Tex.Cr.App. 1997); *and, Walbey v. State,* 926 S.W.2d 307, 313, n. 8 (Tex.Cr.App.1996) ("Texas trial judges have the discretion to instruct capital juries on the issue of parole and may find such instruction an effective means of charging the jury on the law applicable to the case." *citing* Tex.Code Crim. Proc. Ann. art. 3.14).

This precedent was called into question in *Brown v. Texas,* —— U.S. ——, 118 S.Ct. 355 (1997), where four justices concurred in the denial of certiorari but recognized Texas law "[p]erversely ... prohibits the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death." *Brown,* 118 S.Ct. at 356. According to the concurring justices, this perverse rule of law "unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose." *Id.,* at 356.

I agree with the *Brown* concurrence; it is perverse indeed when the decision to provide a capital jury with truthful sentencing information is left to the trial judge's discretion. I would hold capital juries must be provided with accurate and truthful information regarding a defendant's parole eligibility. Because the majority does not so hold, I dissent to the resolution of points of error four and five.

OVERSTREET, Judge, concurring and dissenting.

I dissent to the majority's holding on points four and five which involve the failure to inform the jury that life imprisonment equals 40 years without parole for capital murder.

Appellant argues that a court's charge informing the jury that life imprisonment is equal to 40 years without parole would be relevant to whether he would be a continuing threat to society. Further, he argues that without this information the jury was prevented from weighing the mitigating effect of punishment testimony.

As I discussed in some detail in my dissent to *Rhoades v. State,* 934 S.W.2d 113, 131–44 (Tex.Cr.App.1996), in light of the United States Supreme Court's holding in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), I believe that the United States Constitution's guarantees of due process required appellant's jury be informed of the 40 year parole eligibility law.

I also note that four members of the Supreme Court have recently commented upon the "[p]erverse[ness]" of our death penalty scheme not letting the jury know when the defendant will become eligible for parole if he

Ginsburg and Breyer, JJ.) (citations and footnote omitted). It is worth noting that it takes only four members of the Supreme Court to grant

certiorari, the same number (including Justice Stevens) who joined Justice Stevens's opinion.

is not sentenced to death. *Brown v. Texas,* — U.S. ——, 118 S.Ct. 355, 139 L.Ed.2d 276 (1997). I also find rather perverse keeping jurors ignorant and uninformed of such a critical legal fact when making life and death decisions as to whether the death penalty will be assessed. By excluding the fact that life imprisonment is equal to 40 years in prison, appellant was denied due process of law.

I respectfully dissent to the majority's discussion and holding as to points four and five. Otherwise, I concur in the disposition of all other points.