In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-04-00127-CR
______________________________


CHRIS SLAUGHTER, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 31211-B


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION
            Just after 5:00 a.m. on a summer morning, led by their scent-tracking dog, Longview police
officers discovered a sweaty and overexerted Chris Slaughter hiding in a children's playhouse in the
neighborhood where Slaughter's mother lived. This concluded the officers' search for a black male
wearing a white T-shirt who appeared to have fled the scene of a pawn shop burglary earlier that
morning,


 where Slaughter's half brother had also been arrested for the burglary. Officers arrested
Slaughter after some resistance. Appealing from his conviction for burglary of a building and his
two-year sentence, Slaughter argues only that the evidence is factually insufficient to support his
conviction. We affirm.
            When reviewing a challenge to the factual sufficiency of the evidence to support the
conviction, we are required to determine whether, considering all the evidence in a neutral light, the
jury was rationally justified in finding guilt beyond a reasonable doubt. Zuniga v. State, 144 S.W.3d
477, 484 (Tex. Crim. App. 2004). There are two ways in which we may find the evidence to be
factually insufficient. Id. First, if the evidence supporting the verdict, considered alone, is too weak
to support the jury's finding of guilt beyond a reasonable doubt, then we must find the evidence
insufficient. Id. Second, if when we weigh the evidence supporting and contravening the conviction
we conclude the contrary evidence is strong enough that the State could not have met its burden of
proof, we must find the evidence insufficient. Id. "Stated another way, evidence supporting guilt
can 'outweigh' the contrary proof and still be factually insufficient under a beyond-a-reasonable-doubt standard." Id. If the evidence is factually insufficient, then we must reverse the judgment and
remand for a new trial. Clewis v. State, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996).
            Admittedly, all the State's evidence against Slaughter was circumstantial in nature. In a
circumstantial evidence case, each fact or piece of evidence need not point directly to the defendant's
guilt; rather, the cumulative effect of all the incriminating facts may be sufficient to support the
conviction. Hooker v. State, 621 S.W.2d 597, 601 (Tex. Crim. App. 1980) (op. on reh'g). 
Circumstantial evidence is no less trustworthy or probative than direct evidence. See Geesa v. State,
820 S.W.2d 154, 158–59 (Tex. Crim. App. 1991), overruled in part, Paulson v. State, 28 S.W.3d
570 (Tex. Crim. App. 2000) (same standard of review applies to direct as well as circumstantial
evidence cases). "Circumstantial evidence alone may suffice . . . if the inferences arising therefrom
prove the fact in question beyond a reasonable doubt." Hankins v. State, 646 S.W.2d 191, 199 (Tex.
Crim. App. 1981). Mere presence of the accused at the scene of an offense is insufficient to support
a conviction. Pickering v. State, 596 S.W.2d 124, 129 (Tex. Crim. App. 1980). But an accused's
presence at the scene is a circumstance that tends to prove guilt and, when combined with other facts,
may indeed show the accused to be guilty of the crime. Wright v. State, 603 S.W.2d 838, 840–41
(Tex. Crim. App. 1979) (op. on reh'g). The factfinder is the exclusive judge of each witness'
credibility and the weight to be given each witness' testimony. Whitaker v. State, 977 S.W.2d 595,
598 (Tex. Crim. App. 1998).
            At the time police were alerted to the pawn shop burglary, Officer Chris Taylor was on his
way home from working an off-duty security job. Taylor, driving his personal pickup truck, heard
the police radio call and went to the scene to see if he could be of assistance. Seeing several officers
already present at the scene, he turned to go home. As he was leaving, he saw a black male emerge
from a wooded area and get in the passenger's side of a waiting white car. Thinking the person
matched the radioed description of one of the burglary suspects who had fled on foot, Taylor
followed the white car. Taylor was able to listen to the ongoing investigation on his police radio but
could not radio in, due to failing battery power. He called the police dispatcher on his cell phone and
advised he was following someone he thought was involved. Despite the darkness of the early hour,
the white car's lights were off. Eventually, marked Longview police vehicles joined in a low-speed
pursuit of the white car. The chase ended when the white car struck a parked vehicle in a residential
area and came to rest partly in a driveway, partly in a yard. Two men ran from the white car, but
Taylor could not catch them. A police dog was brought to the scene, and, from the scent on a T-shirt
found near where the suspects abandoned the white car, the dog led officers to the playhouse where
Slaughter was hiding. 
            The evidence supporting the conviction included a break-in at a storage unit connected to a
pawn shop, Slaughter's half-brother pawning items at that pawn shop, some of the items pawned by
Slaughter's half-brother being stacked outside the pawn shop during the burglary, Slaughter's half-brother being arrested at the scene of the burglary, and Slaughter's other half-brother mysteriously
arriving at the scene of the wrecked and abandoned white car shortly after Slaughter and the driver
fled the scene of the accident. Officer Taylor heard over the radio that one of the suspects was seen
fleeing the burglary scene on foot, wearing a white shirt. Taylor, near the burglary scene, saw a
black male wearing a white T-shirt emerge from the woods and get into a white car, which was
driven through the early morning darkness without lights for a period of time. When that car was
in an accident, the driver and passenger fled the scene. Taylor identified one of the fleeing subjects
as the one he had seen emerge from the wooded area near the burglary scene. Slaughter was found
several houses away from the wrecked car, hiding in a children's playhouse and sweating as if he had
been running. He offered at least some resistance to the officers arresting him.
            "While flight itself does not amount to a presumption of guilt, it is a circumstance from
which an inference of guilt may be drawn." Arivette v. State, 513 S.W.2d 857, 862 (Tex. Crim. App.
1974).
 
 
 
 
 
            We find the evidence sufficient to support the jury's verdict. We overrule Slaughter's point
of error and affirm the judgment of the trial court.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          May 18, 2005
Date Decided:             June 24, 2005

Do Not Publish 
 




o writ). Clear and convincing evidence is "that degree of proof
which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the
allegations sought to be established." State v. Addington, 588 S.W.2d 569, 570 (Tex. 1979).
            When the State seeks court-ordered temporary mental health services under subsection (a),
as it did here, specific requirements for clear and convincing evidence are imposed: the evidence
must include expert testimony and, unless waived, evidence of a recent overt act or a continuing
pattern of behavior that tends to confirm:
(1) the likelihood of serious harm to the proposed patient or others; or
(2) the proposed patient's distress and the deterioration of the proposed patient's
ability to function.

Tex. Health & Safety Code Ann. § 574.034(d). An expert diagnosis, without more, is not
sufficient to confine a patient for compulsory treatment. Mezick, 920 S.W.2d at 430. The State
cannot meet its burden of proof without presenting evidence of the behavior of the proposed patient
that provides the factual basis for the expert opinion. Id. The recent overt act or continuing pattern
of behavior shown by the State must also relate to the criterion on which the judgment is based. See
T.G. v. State, 7 S.W.3d 248, 252 (Tex. App.—Dallas 1999, no pet.).
C.        Standards of Review
            To review the legal sufficiency of the evidence where the burden of proof is clear and
convincing evidence, we consider all of the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or conviction that its
findings were true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the trier
of fact resolved disputed facts in favor of its finding if a reasonable trier of fact could do so, and
must disregard all evidence that a reasonable trier of fact could have disbelieved or found to be
incredible. Id.
            In reviewing factual sufficiency challenges, we review all the evidence in the record, both
that in support of and contrary to the trial court's findings. In re C.H., 89 S.W.3d 17, 27–29, 45
(Tex. 2002). We must give due consideration to evidence the trier of fact could reasonably have
found to be clear and convincing. Id. at 25. Under the clear and convincing standard, we determine
whether the evidence is such that the trier of fact could reasonably form "a firm belief or conviction"
as to the truth of the allegations sought to be established by the State. Id. We must consider whether
disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed
evidence in favor of its finding. J.F.C., 96 S.W.3d at 266. The trial court as the trier of fact is the
exclusive judge of the credibility of the witnesses and the weight to be given their testimony. In re
Estate of Canales, 837 S.W.2d 662, 669 (Tex. App.—San Antonio 1992, no writ).
III.      ANALYSIS
            R.G. does not challenge the determination that he was mentally ill. See Tex. Health &
Safety Code Ann. § 574.034(a)(1). However, he challenges the evidence supporting the findings
required pursuant to Section 574.034, arguing that the State failed to present sufficient evidence of
a recent overt act or continuing pattern of behavior that tends to confirm the likelihood of serious
harm to R.G. or that tends to confirm R.G.'s distress and the deterioration of his ability to function.


 
We must, therefore, determine whether the State presented sufficient evidence of such nature.
A.        Stated Desire to Die
            In Dr. Fagan's certificate, he referred to the family's report that R.G. had been "stating he
wants to die." This phrase is the only reference to such statements. Dr. Chadalavada did not testify
to any such statements by R.G. From this short, general reference in Dr. Fagan's certificate, we
cannot determine the context in which R.G. may have made statements to this effect. And, certainly,
there is no evidence R.G. attempted suicide or purposely harmed himself. So, we cannot conclude
that Dr. Fagan's five-word notation in his certificate constitutes evidence of a recent overt act or
continuing pattern of behavior that tends to confirm the likelihood of serious harm to R.G. or a
substantial deterioration of R.G.'s ability to function independently. See Tex. Health & Safety
Code Ann. § 574.034(d).
B.        Not Taking Care of Himself
            Dr. Chadalavada testified that R.G. was not taking care of himself. The San Antonio court
analyzed similar testimony in In re J.S.C., 812 S.W.2d 92, 96 (Tex. App.—San Antonio 1991, no
writ). There, the doctor testified the patient was "not able to take care of himself outside the
hospital," but gave no specific facts to support the statement. Id. The court pointed out that the
doctor did not state what specific tasks the patient was unable to do. Likewise, we cannot determine
what specific acts or omissions to which Dr. Chadalavada refers by his general observation. 
Therefore, we will address the two more specific acts of which the State presented evidence: R.G.'s
refusal to eat and his refusal to take medication. We will measure such refusal against the statutory
requirements of Section 574.034(d) to determine whether the State's evidence was clear and
convincing. 
C.        Refusal to Eat
            A proposed patient's refusal to eat may be sufficient evidence to support an order for
temporary commitment when there is specific evidence of the patient's refusal and the resulting harm
that refusal has caused to the proposed patient. Compare K.T. v. State, 68 S.W.3d 887 (Tex.
App.—Houston [1st Dist.] 2002, no pet.) (holding that evidence was insufficient when State
presented evidence of patient's refusal to eat while hospitalized but failed to show that her refusal
resulted in malnutrition or other harm) with State ex rel. Y.A-Y., No. 12-03-00242-CV, 2004 Tex.
App. LEXIS 2961 (Tex. App.—Tyler Jan. 8, 2004) (mem. op.) (holding that evidence was sufficient
when State presented evidence of patient's refusal to eat and drink for days at a time and resulting
weight loss and risk of dehydration).
            In K.T., the State presented evidence that K.T. had "stopped eating food at the home and she
is paranoid that her food is being poisoned, and she hasn't been taking care of herself." K.T., 68
S.W.3d at 891–92. The K.T. court noted that there was no evidence that K.T. had stopped eating
outside the hospital or that her refusal had resulted in malnutrition or other harm.


 Id. at 893. The
court did not dispute the evidence of K.T.'s mental illness, but it reiterated that such evidence alone
will not satisfy the statutory requirements. See id. (citing Broussard v. State, 827 S.W.2d 619, 622
(Tex. App.—Corpus Christi 1992, no writ)).
            Similarly, the San Antonio court concluded that the evidence was insufficient in In re
Breeden, 4 S.W.3d 782, 788–89 (Tex. App.—San Antonio 1999, no pet.). The doctor in Breeden
testified that the patient was not eating properly and was refusing medication. Id. at 786. The court
reversed the trial court's order based on insufficiency of the evidence, however, since the State failed
to present evidence that such acts or omissions resulted in malnutrition. Id. at 788–89. The court
also noted that the evidence showed that the patient's dietary decisions were based on his concern
for animal rights. Id. at 788.
            In Y.A-Y., the State presented expert testimony diagnosing Y.A-Y. as mentally ill and
describing his behavior and some specific acts. See Y.A-Y., 2004 Tex. App. LEXIS 2961, at *3–5. 
Most relevant to the case here is the doctor's testimony that Y.A-Y. refused to eat or drink for four-
or five-day periods and that, as a result, he lost ten pounds. Id. at *3. The doctor testified that a
continued refusal to eat or drink could have resulted in further weight loss and a failure of his bodily
functions due to dehydration. Id. The court drew from the doctor's testimony that Y.A-Y. attempted
to take his own life by starving himself to death. Id. at *9. The Tyler court concluded that, even
though Y.A-Y. was unsuccessful, his refusal to eat for days at a time was likely to cause serious
harm. Id. Accordingly, the court held that such expert testimony presented evidence of an overt act
that tended to confirm the likelihood of serious harm to Y.A-Y. Id.
            Here, Dr. Chadalavada testified that R.G. had been refusing some food, to which R.G.
admits. However, the doctor indicated that R.G. had been eating recently. So, the record is unclear
as to the extent to which R.G. was refusing to eat. That is, we do not know whether R.G. refused
to eat anything at all for periods of time, as did the patient in Y.A-Y., or whether he was refusing only
certain foods consistently. Further, the doctor provided no testimony of any adverse health effects
such as weight loss, weakness, dizziness, etc. that may have illustrated how R.G.'s refusal of some
food would pose a risk of serious injury to himself.


 We lack evidence, present in Y.A-Y., of the
severity of R.G.'s refusal to eat or any resultant harm. Without such, we cannot conclude that a
refusal of some amount of food is evidence of a recent overt act which would tend to confirm the
likelihood of serious harm to R.G. In theory, such refusal could be beneficial, as in the case of
reducing caloric intake or avoidance of certain categories of food. We simply cannot tell from the
State's evidence that R.G.'s alleged refusal to eat confirms the likelihood of harm to himself or a
deterioration of his ability to function.
            Therefore, we conclude that the State failed to show that R.G.'s refusal of food is a recent
overt act that tends to confirm the likelihood of harm as required by Section 574.034(d)(1). 
Similarly, without evidence regarding a negative impact R.G.'s diet has on his mental, physical, or
emotional condition, we cannot conclude that such refusal constitutes evidence of conduct that
confirms R.G.'s distress and deterioration of his ability to function. To the contrary, Dr. Chadalavada
testified that R.G. was able to feed and bathe himself and perform "basic functions." 
D.        Refusal of Medication
            Dr. Chadalavada testified that R.G. had refused to take Risperdal. Such evidence alone is
insufficient evidence of an overt act or a continuing pattern of behavior that demonstrates the
patient's distress and the deterioration of the patient's ability to function. See J.M. v. State, 178
S.W.3d 185, 194 (Tex. App.—Houston [1st Dist.] 2005, no pet.); see also G.H. v. State, 96 S.W.3d
629, 635 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (holding evidence legally insufficient to
show substantial mental or physical deterioration despite physician's opinion that patient would
continue to deteriorate if not medicated).
            Even considering R.G.'s refusal of medication with the other evidence, it still does not tend
to confirm the likelihood of harm to R.G. or his distress and deterioration of his ability to function. 
R.G. provided two bases for his refusal to take Risperdal. He stated that he felt he did not need the
medication and that he knew and disliked the side effects associated with that drug. Dr. Chadalavada
explained that Risperdal initially can cause "some kind of movement disorder" and "can cause
stiffness." He also explained that the drug can cause drowsiness and tremors. So, R.G.'s decision
to not take the medication, though perhaps not a wise decision according to the doctor's testimony,
demonstrates that R.G. was able to consider his own well-being and weigh the benefits and side
effects of taking the medication. This reasoning runs contrary to the trial court's findings that R.G.'s
condition was in the process of deterioration to the point that he could no longer function
independently and that R.G. was unable to make a rational and informed decision as to whether to
submit to treatment. We point out, too, that Dr. Chadalavada provided R.G. with the option of
taking other medications to treat his condition. Allowing R.G. to express such choices is at least
some indication that the doctor had some confidence in R.G.'s decision-making skills. We also note
that, although R.G. did refuse to take the Risperdal, he expressed his willingness to consider taking
other medication. 
IV.      CONCLUSION
            Here, as in K.T., the doctor's testimony and both doctors' certificates present conclusions in
terms of Section 574.034. However, the facts on which the doctors have based those conclusions
do not present clear and convincing evidence to support the trial court's order. We, therefore,
conclude the trial court could not have properly made the findings required by Section 574.034 by
clear and convincing evidence because there was no evidence of a recent overt act or continuing
pattern of behavior that tends to confirm the likelihood of serious harm to R.G. or a substantial
deterioration of R.G.'s ability to function independently to provide for his basic needs. See Tex.
Health & Safety Code Ann. § 574.034(a), (d)(1), (2).
            Accordingly, we reverse the trial court's judgment and render judgment denying the
application for temporary mental health services. Further, since it appears that R.G. is still in the
hospital as of the date of the issuance of this opinion, we will entertain any motion to issue the
mandate early. See Tex. R. App. P. 18.1(c).
 
                                                                                    Jack Carter
                                                                                    Justice

Date Submitted:          February 1, 2006
Date Decided:             February 2, 2006