Gaylon George WALBEY,
Jr., Petitioner,

v.

Gary L. JOHNSON, Director, Texas Department of Criminal Justice, Institutional Division, Respondent.

No. CIV.A.G–99–496.

United States District Court,
S.D. Texas,
Galveston Division.

Aug. 22, 2000.

Brian William Wice, Attorney at Law, Michael B. Charlton, Attorney at Law, Houston, TX, Gaylon George Walbey, Jr., Huntsville, TX, pro se.

Gena Blount Bunn, Texas Attorney General, Austin, TX, for Gary Johnson, Di-

rector, Texas Department of Criminal Justice—Institutional Division, respondents.

### ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING SUMMARY JUDGMENT

KENT, District Judge.

Now before the Court is Gaylon George Walbey, Jr.'s Petition for Writ of Habeas Corpus (the "Petition"), filed September 20, 1999, and Respondent's Motion for Summary Judgment, filed February 24, 2000. For the reasons set forth below, the Petition is **DENIED,** but Respondent's Motion for Summary Judgment is **GRANTED.**

### I. PROCEDURAL BACKGROUND

On July 11, 1994 Walbey was convicted of capital murder under Section 19.03(a)(2) of the Texas Penal Code and assessed the death penalty pursuant to the jury's answers to special issues. The Texas Court of Criminal Appeals affirmed the conviction in an opinion published on June 26, 1996. *See Walbey v. State,* 926 S.W.2d 307 (Tex.Crim.App.1996). On July 1, 1997, Walbey filed his original application for writ of habeas corpus in the 56th Judicial District Court of Galveston County, Texas, which he later amended on December 29, 1997. The habeas judge, who did not preside over Walbey's trial, conducted an evidentiary hearing to determine whether Petitioner was denied effective assistance of counsel during the punishment stage of his jury trial. On May 28, 1998, the state habeas court filed its findings of fact and conclusions of law recommending the granting of state habeas relief. On June 2, 1999, however, the Court of Criminal Appeals overturned the trial court's determination and denied all state habeas relief requested by Walbey. Walbey filed the instant petition on September 20, 1999.

### II. FACTUAL BACKGROUND OF THE CASE [1]

On May 4, 1993, the victim and Maria Eliaz, both instructors at Galveston College, spent the day together preparing for the end of the semester. At about 4:50 p.m., the victim left the campus to drive to her home three blocks away, intending to return before 6:00 p.m. for a class. When she arrived at home, she parked her vehicle in front of her house and waved to a neighbor. She entered her home through the back door. A neighbor boy heard the door slam shut, a man yell "shut up" many times, and muffled screaming and banging. Another witness saw a young black male driving away from the victim's house in the victim's car about 7:10 that evening. The victim never returned to campus. At 6:45 p.m., Eliaz left campus and drove to the victim's residence. Not seeing the victim's "turquoise green" Ford Explorer, Eliaz assumed they had missed each other and she went home. When the victim did not appear at work the next morning to administer a final exam, a neighbor was called and asked to check on her. After the back door "just came open" to his touch, the neighbor entered the residence and discovered the victim's body. He summoned the police. Officer J. Jennings arrived on the scene. He observed blood everywhere and evidence of a struggle. A barbecue fork and a butcher or carving knife protruded from the victim's back. Another knife handle, without the blade, lay by the victim's head. The victim was also noted to have an extension cord wrapped around her neck and little red flecks of what appeared to be paint were observed around her body. In the kitchen, Jennings found two large knives with bloody hand prints on the grip and what appeared to be blood and flesh on the blades. Jennings also found a red fire extinguisher that was missing paint and dented up, and appeared

---

**1.** These facts are reproduced from the opinion set forth by the Court of Criminal Appeals.

*Walbey,* 926 S.W.2d at 308–09.

to have blood and hair on it. Shoe prints, palm prints, and fingerprints were embedded in the dust on top of the refrigerator. Jennings further noticed that the hallway overhead light upstairs did not have a light bulb in it. The missing bulb was found in a potted plant on the floor nearby. Next to the plant, the officer discovered a balled-up bloody shirt. Jennings found blood smears on the bathroom door and a pinkish stain in the sink as if blood had been washed down it. In the victim's bedroom, one of the windows had been broken and pieces of the broken glass were stacked in a neat pile against the house on the roof outside. Finally, Jennings noted that the air conditioner was off with no extension cord attached with which to run it. An extension cord capable of running an air conditioner was found downstairs. Fingerprints on at least one of the knives, the barbecue fork, and the fire extinguisher were later identified as [Walbey]'s, as were fingerprints recovered from the broken window in the bedroom, the air conditioner shroud, the top of a CD storage box, a piggy bank, the hall telephone, and the refrigerator. Also, Jennings found evidence that a mask had been cut from a sheet. Further investigation revealed that [Walbey] either waited some time for the victim to return home or lingered a while after the murder, as evidenced by the fact that he smoked at least three cigarettes down to the butt during the time he was in the residence. [Walbey] was apprehended driving the victim's vehicle. [Walbey] eventually confessed to the crime.

Additional investigation revealed that [Walbey] bonded one Robert Schreiber out of jail at approximately 10:00 p.m. on May 4, 1993. Schreiber and [Walbey] drove away from the jail in a Ford Explorer. Schreiber testified that the two of them drove around until daylight. Among places they visited, according to Schreiber, was [Walbey's] "mother's" house in Galveston.[2]

Schreiber told the jury that appellant entered the residence through the back door and returned to the vehicle with a stereo, VCR, cable box, and a radio/CD player. After pawning one of the items, [Walbey] and Schreiber returned to the house and [Walbey] retrieved a television and another VCR. Testimony from a neighbor indicated that [Walbey] had been "lurking" around the victim's backyard within weeks before the offense.

The medical examiner testified that the victim died as a result of massive trauma to the head—probably a combination of a concussion and contusions to the brain and bleeding from massive scalp lacerations. He also observed small flecks of red paint in and under the victim's skin and in her hair. The examiner further noted that the victim had a large cut to the back of the neck, stab wounds to the ears, numerous stab wounds to her back, and bruises and abrasions to her upper back, neck, and hands. One stab wound to the victim's back penetrated the bone to the extent that the knife blade could not be pulled out. A second stab wound to the back went through to the lung. Because of the lack of bleeding around the stab wounds, the medical examiner concluded that the victim was probably dead when she received the stab wounds to her back. He further testified that the victim suffered for at least ten to fifteen minutes as she was beaten about the head and shoulders with the fire extinguisher.

## III. STANDARD OF REVIEW

When ruling on a motion for summary judgment, the evidence is viewed through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). In this case, because Walbey's Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254

2. Through photographs, Schreiber identified the residence he and [Walbey] went to as the victim's home.

554

(West 1994 & Supp.1998),[3] that prism differs depending upon whether the issue is one of law, fact, or both. *See Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).

For questions of fact, habeas relief may be granted only if the Court finds that the state court made a determination of fact that was unreasonable in light of the evidence presented to it. *See* 28 U.S.C. § 2254(d)(2); *Drinkard,* 97 F.3d at 767–68. When reviewing such factual determinations, the Court must presume correct the factual findings of the State court, unless the Petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." See 28 U.S.C. § 2254(e)(1); *Jackson v. Anderson,* 112 F.3d 823, 824–25 (5th Cir.1997), *cert. denied,* 522 U.S. 1119, 118 S.Ct. 1059, 140 L.Ed.2d 120 (1998). On the other hand, when considering questions of law, the Court may grant habeas relief only if the state court's determination of law is contrary to "clearly established" Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1); *Drinkard,* 97 F.3d at 768. Habeas relief generally may not be premised on rules of constitutional law that have yet to be announced or that were announced after the challenged conviction became final. *See Teague v. Lane,* 489 U.S. 288, 305–08, 109 S.Ct. 1060, 1073–74, 103 L.Ed.2d 334 (1989). Finally, for mixed questions—that is, those containing issues of law and fact[4]—relief is granted only if the state court decision rests on an "unreasonable application of ... clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), *i.e.,* when the state decision "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Williams v. Taylor,* 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). In any event, "mixed questions of law and fact, are reviewed de novo." *Johnson,* 180 F.3d at 210 (citing *Johnson v. Puckett,* 176 F.3d 809, 814 (5th Cir.1999)); *see also Bryant v. Scott,* 28 F.3d 1411, 1414 (5th Cir.1994). "So-called mixed questions of fact and law ... require the application of a legal standard to the historical-fact determinations ...." *Townsend,* 372 U.S. at 309 n. 6, 83 S.Ct. 745 n. 6, 9 L.Ed.2d 770.

The ultimate determination of ineffective assistance of counsel is a mixed question of law and fact, and thus qualifies for independent review by the Court. *See Thompson,* 516 U.S. at 112–13, 116 S.Ct. at 457; *Burdine v. Johnson,* 66 F.Supp.2d 854, 860 (S.D.Tex.1999). The inquiry first must begin with the underlying facts of the case as it requires the Court to apply those facts to the applicable law. While the Texas Court of Criminal Appeals did not specifically adopt the Texas District Court's Findings of Fact, the Texas District Court made the "determination[s] after a hearing on the merits of the factual issue[s]," and its findings are thus subject to a presumption of correctness. *See Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 765, 66 L.Ed.2d 722 (1981); *Craker v. Procunier,* 756 F.2d 1212, 1213–14 (5th Cir.1985) ("The state [habeas] trial court's ... factual findings are ... entitled to a presumption of correctness [under § 2254(d) .... [T]he Texas Court of Criminal Appeals did not reject the factual findings of the state trial court; it merely held that the facts as found did not entitle Craker to relief."); *see also Magouirk v.*

**3.** The Fifth Circuit has determined that the AEDPA applies to cases where a petition for habeas corpus is filed on or after April 24, 1996. *See Williams v. Cain,* 125 F.3d 269, 274 (5th Cir.1997), *cert. denied,* 525 U.S. 979, 119 S.Ct. 441, — L.Ed.2d — (1998).

**4.** A mixed question of law and fact has been defined as a question "in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982).

*Phillips,* 144 F.3d 348, 362 (5th Cir.1998) (noting that the state trial court's findings were entitled to a presumption under § 2254(d)). There does not appear to be a question of fact to be addressed by this Court—though the transcript taken at the evidentiary hearing includes relevant information not discussed in the state trial court's Findings of Fact, which the Court now evaluates. The major issue that remains, then, is the legal significance of Petitioner's trial counsel's performance during the punishment phase of his trial. This inquiry requires the Court to apply the facts to the law (*i.e.*, it is a mixed question of law and fact)—under a de novo review.

## IV. PETITIONER'S ASSERTED GROUNDS FOR RELIEF

### A. Ground One

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel at the punishment phases of his capital murder trial.

██ Petitioner asserts that defense trial counsel rendered ineffective assistance of counsel by allegedly: (1) failing to properly investigate and present mitigation evidence; and (2) failing to adequately prepare expert witness Dr. Curtis Edwin Wills to testify.

In order to demonstrate a deprivation of his Sixth Amendment right to the effective assistance of counsel, Petitioner must show both that counsel's representation fell below professional norms, and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("[T]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."). The court may reject an ineffective assistance claim for want of either

deficient performance or actual prejudice, thereby eliminating the need to inquire further if Petitioner fails to carry his burden on either element. *See id.* at 697, 104 S.Ct. at 2069. Moreover, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 2065. The Court must indulge a *strong* presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance. *See id.* at 2065–66.

Petitioner's first claim of ineffective assistance rests on his assertion of prejudice resulting from a failure on the part of his trial counsel, Mr. Roger Ezell, to pursue a more aggressive "mitigation" strategy during the punishment phase. The Court finds, however, that Mr. Ezell's advocacy on behalf of Petitioner did not fall to the level of ineffective assistance of counsel; rather he employed a sound trial strategy after considering all the relevant factors. Mr. Ezell testified under cross examination at the evidentiary hearing conducted by the state trial court that he recognized the apparent futility in pursuing a strategy based predominately on mitigation. *Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, Ex Parte Gaylon George Walbey, at 88* (56th Dist. Ct., Galveston County, Tex. Nov. 30, 1998) ("I picked future dangerousness as a real point of emphasis because of the lack of violence in his past, and I think mitigation needed to be touched upon, but it certainly was not the part that was stressed."). The crime committed was extremely brutal, which explains why trial counsel, after carefully considering his options, elected not to pursue a strategy built around mitigation. Petitioner's trial counsel also predicted correctly that the prosecution was preparing to call witnesses to testify about Petitioner's history of truancy, lying, stealing, and burglary—all of which would minimize the effectiveness of a mitigation defense. *See id.* at 92–93. On the other hand, trial counsel focused on the fact that "there hadn't been a lot of violence" in

Petitioner's past, and that "there was no evidence of other violent acts in his past." *Id.* at 96.

Mr. Ezell fervently believed that pursuing a mitigation defense would have been a "bad strategy." *Id.* at 119 (explaining that "[i]n my opinion [mitigation is] a bad strategy, it would be wrong, and it creates him as a monster that may or may not ever be able to be helped"); *see id.* at 97 (suggesting that a mitigation defense is weaker "[i]n the sense that I don't think juries buy into it very often . . . . I think it comes with baggage because if you get into that being part of the reason for the crime you run the risk of the jury thinking just because of the background a sociopathic monster had been created that may not be able to be corrected.").[5] In fact, based on his experience both as an assistant district attorney and as a defense lawyer (who, while never before having defended a capital case, had nevertheless performed appellate work, prepared trial briefs, and watched several capital cases), Mr. Ezell testified that he had never heard of a Galveston County jury that accepted the mitigation defense. *Id.* at 97–98 ("In my experience [juries] do not buy into it enough to save a man's life."); *id.* at 155 ("I have never seen a mitigation defense work in this particular courthouse."). After considering all his available options, Mr. Ezell also realized that unlike a future dangerousness strategy, a mitigation defense would not allow an expert to make an evaluation or offer an opinion. *See id.* at 136–37. All these factors formed the calculus used by Mr. Ezell in deciding to place a greater emphasis on a future dangerousness defense.

Petitioner also asserts the trial counsel failed to properly conduct an investigation into whether mitigation should have been adopted as the primary defense at the punishment stage. The record, however, does not substantiate Petitioner's claims.

Mr. Ezell acknowledges that after hiring Dr. Wills as his mental health expert, "we discussed the mitigation and future dangerousness and decided we needed to probably emphasize the future dangerousness." *Id.* at 95. In fact, Mr. Ezell's early discussions with Dr. Wills, who had testified about future dangerousness and mitigation numerous times in capital cases, led him to pursue a lack of future dangerousness strategy. *See id.* at 96 ("[M]y recollection is the first phone call we discussed the case, discussed the issues, and pretty much both of us talked about the future dangerousness issue being probably a better emphasis."); *id.* at 124 ("We had an initial discussion and I gave him the fact that there was a—the kid had a horrible background. We talked about whether or not he had a violent background. We talked about whether he had any other violent—convictions for violence. I sent him all those materials and we talked again."); *id.* at 119 ("I am of the opinion, and in talking to Doctor Wills he was of the opinion, and we formed that opinion that, yes, emphasizing the mitigation would be a mistake."); *id.* at 123 (denying vehemently that he told Dr. Wills to ignore mitigation evidence, but reiterating that he and Dr. Wills worked together to develop their trial strategy). Mr. Ezell's strategy decision was buttressed by the opinions he received from respected local criminal defense attorneys. *See id.* at 156. At the time of trial, there apparently existed a consensus that future dangerousness presented the best option. *See id.* at 56 (noting that it "was not only reasonable but probable that having Dr. Wills advocate both a future dangerousness and a mitigation defense would 'lead to conflicting testimony' and thereby 'destroy each other' ").

The Court also finds that Mr. Ezell prepared Wills to testify at trial. *See id.* at 99–102 (noting that prior to trial, Dr. Wills

---

**5.** The issue is not whether the expert, Dr. Wills, would have pursued a different trial strategy, for he is not an attorney, nor is he knowledgeable about the legal nuances of conducting a capital punishment defense.

was provided a detailed synopsis of the case, including the facts the prosecution likely was going to elicit from him during cross-examination); *id.* at 122 (indicating that Mr. Ezell "supplied everything [to Dr. Wills] in that psychological and background package that the D.A.'s office gave" to him, which included CPS reports and school records). By his own admission, Dr. Wills acknowledged—in an affidavit signed less than a month before he testified at the habeas evidentiary hearing—Mr. Ezell's alacrity in preparing him to testify in the case:

> .... My primary duty [at Petitioner's trial] was to determine the probability the defendant would be a future danger to society.
>
> To make that evaluation I interviewed the defendant, Mr. Walbey. I met with defense counsel Mr. Roger Ezell, who discussed *all the details* of the case with me. From Mr. Ezell I obtained a large quantity of Child Protective Services' records, and medical records of the defendant. The medical records included a complete medical history of the defendant.... I do not feel any additional psychological evaluation of the defendant would have assisted in my determination of the future danger issue.
>
> A *thorough explanation of the defense theory* in this case was explained to me by defense counsel Mr. Ezell....
>
> In preparation for my testimony, Mr. Ezell took the time to review questions he would ask me on the stand. *He also explained possible cross-examination I could expect from the State.*
>
> My review of the defendant's medical records, his criminal history, the nature of this case, my experience in capital murder testimony, and the preparation of Mr. Ezell were the basis of my testimony. *I can say with the help of Mr. Ezell I was prepared to testify in this case as well as I ever was in a capital murder trial.*

*Curtis Edwin Wills Aff.* at 1–2 (emphases added).

At trial, Dr. Wills testified as to the probability of future dangerousness. He first told the jury that Petitioner likely committed the crime because the victim had startled him while he was in the act of burglarizing the victim's home. Dr. Wills' theory was that Plaintiff killed the victim in order to avoid being identified and caught. *See Curtis Wills' Testimony Before the Jury, at 193; see id.* at 194 ("[O]bviously if the deceased had not been there, she would not have been killed. I think that's obvious."). He then acknowledged to the jury that "[t]he research that has been done on [future dangerousness] has not given me the ability to predict [whether Petitioner would commit future robberies or burglaries] from this one episode of violence." *Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, at 133* (noting that this response was favorable to the defense on future dangerousness); *Curtis Wills' Testimony Before the Jury, at 188* ("There's no confidence in predicting [whether Petitioner will be violent again]".); *see id.* at 198–99 (testifying that a single violent act "does not give a high predictability" that another violent act will occur).[6] Dr. Wills, however, concluded that Petitioner was unlikely to commit such a brutal act in the future because (1) Petitioner did not have a violent history, and (2) he "would be in prison a long time and that violent traits usually fade over time." *Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, at 113; see id.* at 121 (noting that after consulting with Dr. Wills, Mr. Ezell reasonably believed that violence "was not a common thing for [Petitioner]. It was a panic situation and a one time thing."); *Curtis Wills' Testimony Before the Jury, at 218* ("Remember we're dealing with an

---

6. In the Court's view, this portion of Dr. Wills' testimony tends to negate Petitioner's claim that Mr. Ezell did nothing on direct examination to stymie the prosecutor's attacks regarding the reliability of Dr. Will's conclusions.

issue now that the individual has 35 years before being eligible for parole. That puts him at 55. We don't find too many 55 year-old burglars placing themselves in that situation."); *id.* at 196 ("He at some point when he's released at 55 years of age is not going to be a danger to society ...."); *id.* at 190 (observing that Petitioner's involvement in violence had been "virtually non-existent") *see also Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, at 37* ("To predict future violent behavior ... the number of past acts have a way of identifying probability for future acts."); *id.* at 38 (observing that "age is, in a large context, highly predictable of violent behavior."). Simply put, Dr. Wills provided testimony that the type of violent behavior employed by Petitioner on the night of the murder likely was an aberration. Given this explanation, the Court finds it plausible that a reasonable jury could have found good cause to conclude that Petitioner did not pose a future dangerous threat to society. Counsel's effort was not simply a perfunctory attempt to cake-walk through the punishment stage; rather, it was grounded in reasonable trial strategy.

The fact that the prosecution at trial was able to "cross up" Dr. Wills does not constitute ineffective assistance of counsel; instead it is a testament to good advocacy skills exhibited by the prosecution. Moreover, it does not discount Dr. Wills' testimony on direct examination that at age fifty five, Petitioner would not likely be a threat to society. Despite the prosecution's vigorous cross examination, Mr. Ezell remained satisfied that Dr. Wills had conveyed to the jury critical information regarding the future dangerousness defense:

Q: If you read the record is it fair to say if you read the whole part of the record you feel you got what you wanted out of Doctor Wills?

A: I feel Doctor Wills may have stumbled a couple of times but we got what we talked about and that's

Gaylon Walbey did not deserve to be killed because of future dangerousness issue.

Q: Do you feel you presented testimony mainly through Doctor Wills that the defendant would not be a future dangerousness 35 years later when he became eligible for parole?

A: Exactly.

Q: Was that your goal and strategy in the punishment stage—now in punishment stage with regard to issue number one; that is, the future dangerousness.

A: Yes.

Q: Did you achieve that?

A: Yes.

*Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, at 135–36.* Although Dr. Wills now insinuates that little time was devoted towards preparing for testimony at trial, the Court finds ample evidence that trial counsel had properly prepared Dr. Wills to testify. *See id.* at 139 (admitting that all background information obtained by Mr. Ezell was forwarded to Dr. Wills, and that those materials were in fact used by Dr. Wills at trial). But even at the evidentiary hearing Dr. Wills acknowledged his preparedness. *See id.* at 59; *see also Curtis Edwin Wills Aff. at 2* ("I can say with the help of Mr. Ezell I was prepared to testify in this case as well as I ever was in a capital murder trial."). Again, the Court finds that after considering all available options and then following the recommendation provided by his expert at the time of trial, Mr. Ezell employed reasonable trial strategy in preparing Dr. Wills for his testimony.

The Court concludes that based upon the totality of the representation afforded Petitioner at trial during the punishment phase, Mr. Ezell's conduct was objectively reasonable. And, even if his representation was deficient, the Court does not find a reasonable probability exists that the outcome would have been different. Indeed, the jury did hear testimony from

family members and former foster care providers concerning Petitioner's background and upbringing, so mitigating evidence actually was presented at trial. These witnesses shared with the jury the fact that Petitioner had been rejected by his birth parents as well as his foster mother. *Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, at 104–05* ("The Eckels and Lola Phillips' testimony was certainly a background on Gaylon, mainly Lola Phillips, to the extent that I wanted to bring out the mitigating circumstances without tainting the jury thinking that Gaylon was unrehabilitable."); *id.* at 140–41 (noting that Ms. Phillips informed the jury that at age five Petitioner's abusive father abducted him, and that it was not until six years later that he finally was discovered and placed in foster care and later admitted to a mental hospital); *id.* at 138–39 (observing that Dr. Wills testified in regard to certain disorders Petitioner had when he was fifteen years old, as well as his truancy records); *id.* at 57 (recording that Dr. Wills discussed mitigation issues during his testimony before the jury); *Curtis Wills' Testimony Before the Jury, at 189* (expounding to the jury Petitioner's horrific upbringing); *Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, at 114* ("We could have tried the basic strategy on [mitigation] and we did. Part of our strategy was testimony to mitigating factors."); *id.* at 119 ("We brought in mitigation. We brought in lack of future dangerousness. And, no, I think we had a

sound trial strategy, and so did the psychologist that I consulted with.").[7]

These witnesses also served an important role in trying to prove lack of future dangerousness, in that they offered credible testimony regarding their "genuine disbelief" that Petitioner could have committed such a crime. *See id.* at 105. While some mitigation evidence was presented, the fact of the matter remains that Mr. Ezell devoted a majority of his attention to pursuing a lack of future dangerousness defense, which he believed was most likely to succeed. The Court refuses to second-guess counsel's judgment. Regardless of the tactics employed, this was a brutal crime, and it is difficult to believe that any defense would have made a difference in the results of this case. It remains a dubious whether Petitioner suffered any prejudice as a result of this trial strategy.

For the aforementioned reasons, the Court, after conducting an independent review of the facts presented in this case, finds overwhelming evidence that the legal significance of Mr. Ezell's preparation and performance at the punishment stage of Petitioner's trial was neither deficient nor prejudicial, as set forth under the standard established in *Strickland*. For these reasons, the Texas Court of Criminal Appeals' decision is affirmed, and, to the extent that the state habeas corpus court's decision may control, the evidence justifies deviation from that court's findings. Accordingly, Petitioner's Ground One is **DENIED**.[8]

7. Petitioner takes issue with Mr. Ezell's decision not to hire a mental health expert to testify in support of the mitigation defense. This issue certainly falls within the realm of trial strategy. Mr. Ezell testified at the evidentiary hearing that an expert could not offer an opinion as to whether the jury should invoke the mitigation defense, so he elected to have family members testify instead. Mr. Ezell also explained that had he brought such an expert to the witness stand, the prosecutor, "Mike Guarino, and I have seen him do it, would have torn up the mental health expert on mitigating circumstances." *Transcript of Hearing on Post–Conviction Writ of Habeas Corpus, at 155.* These all constitute valid,

strategic reasons, for approaching the mitigation defense. Moreover, the Court does not find that utilizing expert testimony would have changed the outcome of the trial.

8. The Court's finding withstands scrutiny under the Supreme Court's recent ruling in *Williams v. Taylor,* an opinion that attempts to clarify the "contrary to" and "unreasonable application" standards contained in § 2254(d). Petitioner claims that the Texas Court of Criminal Appeals' application of clearly established law was objectively unreasonable, in light of the facts presented in *Williams.* The Court disagrees. In *Williams,* the Supreme Court found that the Virginia

### B. Ground Two

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by accepting venire member Priscilla Scruggs as a juror.

■ Petitioner asserts that defense counsel rendered ineffective assistance of counsel by accepting venire member Priscilla Scruggs as a juror. Petitioner's counsel and the prosecution both examined Scruggs during voir dire. *See* 6 SR 578–605. During the course of her examination, she did offer testimony indicating that subconsciously she would be unable to disregard a coerced confession. *See* 6 SR 599–600. For this reason, the defense challenged Scruggs for cause. *See id.* Before the court ruled, however, Scruggs was informed that the jury would be instructed not to consider a confession it determined had not been made freely and voluntarily. Upon hearing this, Scruggs testified that she could follow the law and the court's instructions, and that she would be able to disregard the confession if she determined it had been coerced. *See id.* at 601. Scruggs's later statement notwithstanding, the defense reasserted its challenge for cause, which the court denied. *See id.* at 602. The defense, however, did not exercise a preemptory challenge to remove Scruggs.

■ Petitioner now claims that Mr. Ezell rendered ineffective assistance of counsel by failing to use a preemptory challenge against Scruggs, because the judge's denial of the challenge for cause was not preserved. The Court disagrees. The Fifth Circuit considers an attorney's actions during voir dire to be a matter of trial strategy, which "cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be 'so ill chosen that it permeates the entire trial with obvious unfairness.'" *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir.1995) (*quoting Garland v. Maggio,* 717 F.2d 199, 206 (5th Cir.1983)). In this case, Mr. Ezell's strategy was not "ill chosen." By the time Scruggs was questioned, only three members of the jury had been selected. *See* 5 SR 278, 417, 6 SR 575. Mr. Ezell had to assert a challenge for cause or exercise a preemptory challenge before the parties could examine the next prospective juror. Hence, by saving the defense's

---

Supreme Court and the Fourth Circuit each failed to apply *Strickland*'s standard for determining prejudice. *Williams,* 529 U.S. at ——, 120 S.Ct. at 1515. Moreover, in applying *Strickland,* the Supreme Court determined that the trial counsel had not conducted a proper investigation, nor had he presented mitigating evidence on behalf of his client at the punishment stage of the trial. *Id.* at 1516. In the case at bar, the Texas Court of Criminal of Appeals "rejected the judge's conclusions of law as not supported by the record" and found that Petitioner "failed to meet his burden to show ineffective assistance of counsel." *Ex Parte Walbey,* No. 41,323–01, slip op. at 2 (Tex.Crim.App. June 2, 1999). This Court, after conducting an independent review of the evidence presented both at the evidentiary hearing and at trial, finds that Mr. Ezell conducted a proper investigation (which, unlike *Williams,* included acquiring Petitioner's juvenile and social services records). Furthermore, the Court finds that, as detailed *supra,* Mr. Ezell presented mitigation evidence to the jury. "The additional mitigating evidence Petitioner has presented in this case fails to rise to the same level of signifi-

cance as found in *Williams*." *Johnson v. Gibson,* No. 99–7089, 2000 WL 1158335, at \*5 (10th Cir. Aug.16, 2000). Next, while the counsel in *Williams* "provided the jury with no reasons to spare Petitioner's life," Mr. Ezell presented a vigorous case at the punishment stage regarding future dangerousness and, to a lesser degree, mitigation. These cases, therefore, are factually distinguishable. In the end, the Texas Court of Criminal Appeals had a reasonable basis for determining that Petitioner's Sixth Amendment Right to effective assistance of counsel had not been violated. That court's decision does not conflict with federal law nor does it apply federal law in an unreasonable manner. On the other hand, the Court finds that the state trial court reached unreasonable conclusions. This Court's independent judgment of this case supports the Texas Court of Criminal Procedure's conclusions, for Petitioner fails to demonstrate a reasonable probability that but for Mr. Ezell's conduct, the result at trial would have been different. *See* 4271. The Court is convinced that Petitioner's sentence of death does not violate the Constitution.

preemptory challenges for future, possibly more objectionable venire members, Mr. Ezell was following sound trial strategy early in the voir dire process. Given that Scruggs unequivocally amended her answer regarding how she would evaluate coerced confessions, she appears to have been as good a juror for the defense as any venire member. For this reason, the Court finds that Petitioner has failed to show deficient performance or prejudice under the *Strickland.*[9] Accordingly, Petitioner's Ground Two is **DENIED.**

### C. Ground Three

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when Mr. Ezell failed to exercise three preemptory strikes that still remained at the conclusion of voir dire.

 Petitioner next asserts—again, without citing a single case—that defense counsel rendered ineffective assistance of counsel by not exercising all available preemptory challenges, thus preventing Petitioner from establishing harm on appeal from the trial judge's denial of the three challenges for cause asserted by the defense. After reviewing the record, the Court concludes that Petitioner cannot meet the prejudice requirement established in *Strickland.* The three challenges for cause made by the defense occurred because of the answers venire members Priscilla Scruggs, Karen Fuller, and Aida Mangel gave regarding a jury instruction forbidding them from considering a confession that they determined as coerced. Like Scruggs (explained *supra*), each venire member later testified they would follow the law and jury instructions. *See* 6 SR 601, 700, 701, 9 SR 1222–24. In Texas, once a prospective juror indicates she can set aside her personal feeling and follow the trial court's instructions, she is not disqualified as a matter of law. *See Kemp v. State,* 846 S.W.2d 289, 298 (Tex.Crim.

App.1992). Thus, the trial judge's decision to deny the challenges for cause was not improper. Petitioner would not have prevailed on this point of error on appeal. Accordingly, Petitioner's Ground Three is **DENIED.**

### D. Ground Four

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when Mr. Ezell failed to object to the State's challenges for cause of venire members Bobbette Kolmansberger and Marjorie Adams.

 Petitioner next asserts—without the benefit of case citations—that defense counsel rendered ineffective assistance of counsel by failing to object to the State's challenge for cause against venire members Bobbette Kolmansberger and Marjorie Adams. The Court, however, finds that both individuals were properly excused for cause due to their unyielding views on the death penalty, which would substantially impair their ability to perform their duties as jurors in a capital murder trial.

 In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court held that the State infringes upon a capital defendant's Sixth and Fourteenth Amendment rights when it excuses for cause all those members of the venire who express conscientious objections to capital punishment. However, a prospective juror may be excused for cause if her views regarding capital punishment "would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *accord Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The determination as to whether or not a juror

---

**9.** Moreover, Petitioner's claim of prejudice is greatly hindered by the Texas Court of Criminal Appeals' conclusion on direct appeal that Petitioner's confession was not coerced. *See Walbey,* 926 S.W.2d at 312–13.

should be stricken for cause is a question of fact. *See Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984) (rejecting the circuit court's determination that it is a mixed question of law and fact). "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province," *Wainwright,* 469 U.S. at 428, 105 S.Ct. at 854, and therefore courts reviewing such findings on habeas review must accord them a presumption of correctness. *See id.; Patton,* 467 U.S. at 1037 n. 12, 1038, 104 S.Ct. at 2891 n. 12, 2892. To this end, *Witt* held that the trial court's finding that a prospective juror could not faithfully and impartially perform her statutory function is a determination of fact, subject to a presumption of correctness on collateral review. *Witt,* 469 U.S. at 428, 430, 105 S.Ct. at 854, 855; *see also Fuller v. Johnson,* 114 F.3d 491, 500–01 (5th Cir.1997) (holding that a trial court's finding of juror bias is entitled to a presumption of correctness under both former U.S.C. § 2254(d) and amended 28 U.S.C. § 2254(e)(1)). Therefore, this Court must presume correct the trial court's decision to exclude Kolmansberger and Adams, based on that court's own observations of their demeanor and credibility, unless Petitioner rebuts that decision with clear and convincing evidence.

The record reveals that the views expressed by Kolmansberger justified the trial court to exclude her for cause. A series of exchanges between the prosecutor and Kolmansberger demonstrated this venire member's inability to answer the special issues in a manner that would invoke the death penalty:

> Q: ... Can you elaborate a little bit on your feelings about the death penalty?
>
> A: I just don't believe in it.
>
> ...
>
> Q: Your feelings about not believing in the death penalty, is this something

you've had for a long time or just something you decided recently?

> A: I think I've always felt that way.
>
> Q: Is it a moral or religious feeling or combination of both? How would you classify the—
>
> A: Probably both.
>
> Q: All right. And with that in mind, do you, first of all, just don't think that death penalty is appropriate under any set of circumstances?
>
> A: Yes.
>
> Q: And, secondly, if you were chosen to serve on a jury, you said you could not perform your function and honor under oath as a juror in a capital murder case?
>
> A: I couldn't in good conscience—but for a death penalty, no, sir.
>
> Q: No matter what the fact situation?
>
> A: That's correct.

6 SR 623–25. Kolmansberger then waffled on her position regarding her ability to answer "yes" to the first special issue, but as the following exchange makes clear, she remained steadfast in her inability to follow the law with regard to the second special issue:

> Q: ... Are you telling me that if you were deciding the second special issue on mitigation that you would always find mitigating circumstances and answer the question, "Yes, there are mitigating circumstances"?
>
> A: Yes.
>
> Q: Realizing that that means life rather than death?
>
> A: Yes.
>
> Q: And that is regardless of the facts because, as you know, there can be some very horrible fact situations in capital murder cases, horrendous facts.
>
> A: Uh-huh.
>
> Q: Brutality, pain and suffering.
>
> A: Uh-huh.

Q: Lots of bad, horrible things. Are you telling me regardless of the facts of the case that you would always answer Special Issue No. 2 with a "Yes, there are mitigating factors," therefore resulting in a life sentence rather than a death?

A: Yes, I would.

*Id.* at 629–30.

The Court finds that the evidence supports the trial court's decision that Kolmansberger's exclusion for cause was proper. It did not violate Petitioner's constitutional rights. Petitioner has presented no evidence to rebut this presumption of correctness.

Prospective juror Adams also remained staunch in her inability to impose the death penalty. The following exchange between the prosecutor and Adams demonstrates why the judge removed Adams for cause:

A: I really don't think that I could come back with that verdict. I've thought about it all week, and I just don't think I can take that responsibility.

Q: Okay. And I respect that, and we just want to make sure we're clear on it. I'm going to have to press you a little more to make sure we're clear.

. . .

Q: I guess we won't know a hundred percent for sure, but are you telling me that you could not do it [impose the death penalty]?

A: Yes, I'm telling you I could not do it.

Q: Could not serve—you could not regardless of the fact situation? And there can be some horrible facts, very brutal—torture, murder or very wanton and needless murder cases. You're saying no matter what the facts, you would never be able to return a verdict that would result in the death penalty being sentenced?

A: Yes, that's what I'm saying.

. . .

Q: ... Are you telling us—we need to be clear on this—are you telling us that no matter what the facts of the case—we're not talking about this hypothetically. No matter what the facts of a capital murder case that you would always find mitigating evidence that would allow you to answer this Special Issue No. 2 "yes," that there is mitigating evidence?

A: Yes.

Q: You feel strongly about that; is that correct?

A: Yes.

9 SR 1026–28, 1032. The Court finds that the evidence supports the trial court's decision that Adams' exclusion for cause was proper, and did not violate Petitioner's constitutional rights. Accordingly, Petitioner's Ground Four is **DENIED.**

E. Ground Five

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when Mr. Ezell failed to object to remarks made by the prosecutor during the punishment-phase jury argument.

Petitioner asserts that defense counsel rendered ineffective assistance of counsel by failing to object to the following remarks made by the prosecutor during the punishment-phase jury argument:

We don't need any other victims of Gaylon George Walbey, Jr. We don't need any more victims, ladies and gentlemen. We don't need another prosecutor down the line to impanel another jury to hear more horrible facts. We don't need that.

I submit to you that life sentence in this case would merely be sentencing another law-abiding citizen to a death sentence. That law-abiding citizen may

be today a girl scout or a boy scout, in school, a cheerleader, what have you. But someday that person may come between Gaylon George Walbey, Jr. and one of his pleasures, one of his pleasures.

18 SR 282–83. "In habeas corpus proceedings, we review allegedly improper prosecutorial statements made during a state trial to determine whether they 'so infected the [penalty phase of the] trial with unfairness as to make the resulting [sentence] a denial of due process.'" *Ables v. Scott,* 73 F.3d 591, 592 n. 2 (5th Cir.1996) (*quoting Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). The Court finds nothing patently objectionable with the prosecutor's statement, for it constitutes a proper plea for adequate punishment and law enforcement. Moreover, the argument is borne out of the evidence presented at trial regarding the issue of future dangerousness. *See Stone v. State,* 574 S.W.2d 85, 90 (Tex. Crim.App.1978). This statement simply did not render the trial fundamentally unfair. The prosecutor was advocating his position with respect to Special Issue Number 1: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?" The Court concludes that the prosecutor's remarks concerning the potential harm Petitioner could reap upon others in the future translates into an appropriate plea for law enforcement and adequate punishment, based on testimony elicited from witnesses during the punishment phase of the trial. Mr. Ezell's failure to object to the argument, therefore, did not amount to ineffective assistance of counsel. Accordingly, Petitioner's Ground Five is **DENIED.**

## B. Ground Six

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when Mr. Ezell failed to object to the State's request to review the defense expert's notes prior to cross-examination.

■ Petitioner asserts that defense counsel rendered ineffective assistance of counsel by neglecting to object to the State's request to review Dr. Wills' notes prior to cross examination. Petitioner's argument is meritless. Rule 705(b) of the Texas Rules of Criminal Evidence permits "a party against whom the [expert] opinion is offered ... to conduct a voir dire examination directed to the underlying facts or data upon which the opinion is based." TEX. R. CRIM. EVID. 705(b)(2000). In this case, Dr. Wills was required to disclose to the State the facts and data underlying his opinion. *See Ramirez v. State,* 815 S.W.2d 636 (Tex.Crim.App.1991). Outside the presence of the jury, the prosecutor sought to examine the test data used by Dr. Wills in his evaluation of Petitioner, which Dr. Wills admitted was not attorney work product. *See* 18 SR 178–79; *Skinner v. State,* 956 S.W.2d 532 (Tex.Crim.App. 1997). Dr. Wills acknowledged that this information served as the underlying facts or data upon which he based his opinion. See 18 SR 177–79. Because the State was entitled access to such data, Mr. Ezell had no basis upon which to object. Hence, Petitioner can prove neither deficient performance nor prejudice under the *Strickland* standard. Accordingly, Petitioner's Ground Six is **DENIED.**

## B. Ground Seven

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when Mr. Ezell failed to challenge the qualifications of State's witness, Michael Trimyer.

■ Petitioner asserts that defense counsel rendered ineffective assistance of counsel by failing to voir dire State's witness Michael Trimyer and challenge his qualifications as a reputation witness. The Court notes, however, that while Mr. Ezell elected not to take Mr. Trimyer on voir dire, he did adequately cross examine him.

Specifically, Mr. Trimyer admitted under cross examination that he was unaware of any particular incidents regarding Petitioner's reputation. *See* 17 SR 8–9. What is more, Mr. Trimyer was forced to acknowledge not only that his only contact with Petitioner dated back to when Petitioner was only ten years-old, but that he was unaware of the circumstances surrounding Petitioner's difficult upbringing. *See id.* at 10–11. Given Mr. Trimyer's testimony, the Court rejects Petitioner's argument that by failing to conduct a voir dire of Mr. Trimyer, Mr. Ezell was unable to elicit testimony regarding Petitioner's disadvantaged background. This type of information was also brought to the jury's attention by other witnesses during the punishment-phase of the jury trial. In sum, the Court holds that Mr. Ezell properly cross examined Mr. Trimyer, and that Mr. Ezell exercised proper trial strategy in choosing to offer evidence of Petitioner's childhood through the direct testimony of the defense witnesses rather than relying exclusively on Mr. Trimyer. Any negative impact of Mr. Ezell's action was *de minimis*. Accordingly, Petitioner's Ground Seven is **DENIED.**

B. Ground Eight

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when the direct appeal counsel failed to challenge on appeal the trial judge's decision to excuse for cause venire member Marcella Sosa.

■ Petitioner asserts that defense counsel on direct appeal rendered ineffective assistance of counsel by failing to challenge on appeal the trial judge's decision to excuse for cause venire member Marcella Sosa. The Court, however, finds that because Sosa was properly excused based on her views regarding the death penalty, Petitioner fails to overcome the *Strickland* hurdle.

■ The Due Process Clause of the Fourteenth Amendment entitles a defendant the right to effective assistance of counsel on appeal. *See Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985). The two-prong *Strickland* test also governs a claim of ineffective assistance of appellate counsel. *See id.* at 687, 104 S.Ct. at 2064. In evaluating the decisions made by counsel on appeal, the Court is mindful that appellate lawyers do not, indeed should not, advance every argument—regardless of merit—urged by the defendant. *See Jones v. Barnes,* 463 U.S. 745, 754, 103 S.Ct. 3308, 3314, 77 L.Ed.2d 987 (1983). In this case, appellate counsel was not ineffective for choosing not to challenge on appeal the excusal for cause of venire member Sosa. As the Court has already observed, the State infringes upon a capital defendant's right under the Fourteenth Amendment when it excuses for cause a venire member who express conscientious objections to capital punishment. *See Witherspoon,* 391 U.S. at 521–22, 88 S.Ct. at 1776–77. However, a prospective juror may be excused for cause if her views regarding capital punishment "would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *accord Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The determination as to whether or not a juror should be stricken for cause is a question of fact. *See Patton v. Yount,* 467 U.S. 1025, 1036, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984) (rejecting the circuit court's determination that it is a mixed question of law and fact). "[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province," *Wainwright,* 469 U.S. at 428, 105 S.Ct. at 854, and therefore courts reviewing such findings on habeas review must accord them a presumption of correctness. *See id.; Patton,* 467 U.S. at 1037 n. 12, 1038, 104 S.Ct. at 2891 n. 12, 2892. To this end, Witt held that the trial court's finding that

a prospective juror could not faithfully and impartially perform her statutory function is a determination of fact, subject to a presumption of correctness on collateral review. *Witt*, 469 U.S. at 428, 430, 105 S.Ct. at 854, 855; *see also Fuller v. Johnson*, 114 F.3d 491, 500–01 (5th Cir.) (holding that a trial court's finding of juror bias is entitled to a presumption of correctness under both former U.S.C. § 2254(d) and amended 28 U.S.C. § 2254(e)(1)), *cert denied*, 522 U.S. 963, 118 S.Ct. 399, 139 L.Ed.2d 312 (1997). Therefore, this Court must presume correct the trial court's decision to exclude Sosa, based on that court's own observations of their demeanor and credibility, unless Petitioner rebuts that decision with clear and convincing evidence.

The record reveals that the views expressed by Sosa ultimately justified the trial court to exclude her for cause. Sosa claimed she could not impose the death penalty for religious reasons. *See* 11 SR 1592. Later, when confronted with questions regarding the special issue on mitigating circumstances, she offered contradictory answers. *See id.* at 1597–98, 1601–02. Sosa nevertheless testified that she could not vote for a death sentence. *See id.* at 1602. In sustaining the State's challenge for cause, the trial court noted that Sosa had testified that she would not impose the death penalty. *See id.* at 1603. The record therefore indicates that Sosa vacillated as to whether she could faithfully perform her legal duty as a juror. As stated in *Wainwright:*

> Despite this lack of clarity [regarding a prospective juror's bias] in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law ... [T]his is why deference must be paid the trial judge who sees and hears the juror.

*Wainwright*, 469 U.S. at 425–26, 105 S.Ct. at 852–52.

Because the trial court properly excused Sosa for cause, appellate counsel's decision not to raise the issue on appeal did not amount to ineffective assistance of counsel. Accordingly, Petitioner's Ground Eight is **DENIED.**

B. Ground Nine

Petitioner was denied his Sixth Amendment right to the effective assistance of counsel because the direct appeal counsel failed to adequately brief whether the evidence was legally sufficient to sustain the jury's finding on the future dangerousness issue.

 Finally, Petitioner asserts that defense counsel rendered ineffective assistance of counsel by failing to adequately brief on appeal whether the evidence was legally sufficient to sustain the jury's finding on future dangerousness. Specifically, Petitioner faults counsel for not citing more case authority on this point in the appellate brief. Lack of string cites notwithstanding, the Texas Court of Criminal Appeals, on direct appeal of this case, published an opinion that thoroughly reviewed the issue. Relying on the record and a plethora of cases, the court concluded that in considering the totality of the evidence, a rational trier of fact could have concluded beyond a reasonable doubt that Petitioner would probably commit criminal acts of violence that would constitute a continuing threat to society. *See Walbey*, 926 S.W.2d at 311. The Court finds that Petitioner's appellate counsel did not act unreasonably by not citing more cases for the Texas Court of Criminal Appeals. Moreover, Petitioner fails to show that listing additional cases would have changed the outcome of the Texas Court of Criminal Appeal's decision. Hence, Petitioner's claim is without merit and Ground Nine is **DENIED.**

## VI. CONCLUSION

Based on the foregoing analysis and findings, the Court concludes that Petitioner has failed to show that he is entitled to

federal habeas corpus relief. Accordingly, Petitioner's Petition for Writ of Habeas Corpus is **DENIED**, and Respondent's Motion for Summary Judgment is correspondingly **GRANTED**. All of Petitioner's claims are **DISMISSED WITH PREJUDICE.** The parties are **ORDERED** to file no further pleadings on this issues in this Court, including motions to reconsider or the like, unless justified by a compelling showing of new evidence not available at the time of the instant submissions. Instead, the parties are instructed to seek any further relief to which they feel themselves entitled in the United States Court of Appeals for the Fifth Circuit, as may be appropriate in due course. **IT IS SO ORDERED.**

### FINAL JUDGMENT

For the reasons set forth in the Court's Order entered this date, Respondent's Motion for Summary Judgment is hereby **GRANTED**. Petitioner's Petition for Writ of Habeas Corpus is correspondingly **DENIED**. All of Petitioner's Claims are **DISMISSED WITH PREJUDICE.**

**THIS IS A FINAL JUDGMENT.**

**IT IS SO ORDERED.**