11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Ira Lavelle Marsh

Appellant

Vs.                   Nos.
11-01-00114-CR & 11-01-00115-CR   B 
Appeals from Dallas County

State of Texas

Appellee

 

After a
joint trial of two indictments, the jury convicted Ira Lavelle Marsh of
possession Awith intent to deliver@ cocaine and unlawful possession of a
firearm. The trial court assessed punishment[1]
in both cases at confinement for 15 years. 
We affirm.

                                                                  The
Indictments

The first
indictment[2]
charged that, on or about September 5, 2000, appellant knowingly possessed Awith intent to deliver@ 4 grams or more, but less than 200 grams, of
cocaine and that he had one prior felony conviction.  The second indictment[3]
charged that, on or about September 5, 2000, appellant knowingly possessed a
handgun within 5 years following his release from confinement for the prior
felony offense.  The second indictment
also alleged a different prior felony conviction for enhancement of
punishment.  The jury made a finding
that appellant Aused or exhibited a deadly weapon@ during the commission of the offense of
possessing cocaine with the intent to deliver.

                                                                  Issues
Presented








Appellant
filed one brief for both appeals.  In
Issues Nos. I and II, appellant argues that the trial court erred in overruling
his objection to the drug evidence Abased on probable cause@ and in not excluding all drug evidence and the gun Abased on an illegal search.@ Appellant argues in Issue No. III  that the use of this evidence violated  TEX. CONST. art. I, ' 9. 
Appellant argues in Issue No. IV that the trial court erred in
overruling his objection Ato his statement that he knew the gun was in the apartment,@ in Issue No. V that the evidence was
insufficient to prove that he possessed the firearm, and in Issue No. VII  that the trial court erred in entering a
deadly weapon finding in Athe drug case.@   Appellant argues in Issue No. VI that the
trial court erred in overruling his objection to a police officer=s testimony Aabout what crack cocaine does to a person and how it is used@ 
based on Arelevance.@  

                                                                    The
Evidence

The first
witness, Officer Samuel Scott McDonnold, testified that he was a police officer
with the Dallas Police Department and that he was in uniform on September 5,
2000, when he came into contact with appellant.  Officer McDonnold and two other officers were on Afoot patrol@ in a Ahigh crime area.@  As
they approached the apartment house at 1603 Grand Avenue, appellant Ajust took off running,@ and Officer McDonnold ran after him.  Officer Michael Mata chased appellant up
some stairs, and Officer McDonnold ran around to another stairway.  When Officer McDonnold got to the second
floor, he heard Officer Mata tell appellant to stop.  Then, Officer McDonnold ran up and saw both of them on the floor
of an apartment.  Officer McDonnold
identified appellant in open court as the man he saw running and as the man he
saw on the floor with the other Dallas police officer.  Relevant portions of Officer McDonnold=s testimony read as shown:

Q: And
what happened whenever you got there?

 

A: Officer
Mata was on top of Mr. Marsh saying, ACuff him.  Cuff him.@  At
that time I placed him in handcuffs. 
Officer Mata immediately got up and retrieved what was a baggie of
cocaine off the countertop.

 

                                                           *    *   
*

 

Q: And
what happened at that point?

 

A: I took
Mr. Marsh downstairs to the squad car. 
I did a search of his person. 
During that time I recovered three bags of marihuana from his left front
pocket as well as one bag of crack cocaine.

 

                                                           *    *   
*

 

Q: And did
you see anything else in that apartment that was considered contraband or - -
that night?








A: Yes, sir.  There was a - - quite a bit of baggies,
empty baggies, a scale, a plate that had cocaine residue on it and a pistol,
a loaded pistol.  (Emphasis added)

                                                                  

Officer McDonnold also testified that appellant had $2,889 in cash when
he was arrested.  There were A9 hundreds, 8 fifties, 33 twenties, 49 tens,
71 fives, no twos and 84 one dollar bills.@  Officer McDonnold said that
this much cash money was Aconsistent with drug transactions.@    The second witness, Officer Michael Mata, testified that he was a
police officer with the Dallas Police Department and that he was in uniform on
September 5 when he came into contact with appellant.  Officer Mata testified that he, Officer McDonnold, and Officer
Gibbs were Adoing a walk through@ of the 1500 and 1600 blocks of Grand
Avenue.  Officer Mata testified that it
was  Areal dark there@ and that it was an area Awhere they sell a lot of drugs, a lot of prostitution, drinking.@ 
Officer Mata said that a group of officers would walk through areas like
that to see what they Acan
walk up on.@ 
Relevant portions of Officer Mata=s testimony read as shown:

Q: Do you have any idea
why [appellant] took off running?

 

A: As we came around the
corner, I saw some guys that were standing right here where the steps are.  There=s a little pay phone right there. 
By the time I look back to see where Officer Gibbs was, we had already
started crossing the street.  Officer
McDonnold had hit the apartment.  He had
already started running.  At that time I
got on the radio and said A1603 Grand.@  We had other officers that were in squad
cars that were on Grand and back here towards Cleveland.  I said A1603 Grand@ so
they knew where we were running.

                                                                  

                                                           *    *   
*

 

Q: Okay.  What happened when you got to the top of the
stairs?

 

A: Like I said, Officer
McDonnold was running up the stairs....[Appellant] doesn=t see me. 
I=m coming up the stairs.  He makes it about halfway.  I=m yelling up to him, you know, AStop.  Dallas Police.@  I
come around the corner.  As I come
around the corner, he=s turning the door.  I look at
his hands, and he=s holding a white clear plastic bag. 
Out of the bottom, I can see what appeared to be large rocks of cocaine.

 

Q: Was that with the same
hand he=s turning the doorknob with, or is it a
different hand?

 








A: No, it=s a different hand.  He had the doorknob with his left hand, and he had the Acrack@ in his right hand.  And I=m facing him.  From this doorway to here it=s maybe 15 feet at most.  I=m already up running full speed coming
around.

 

Q: Okay.  So what happened to that point?  You saw him with his hand on the doorknob?

 

A: Correct.  We=re actually probably about this close. 
As I go to reach for him, he turns the door and goes into the
apartment.  As he turned into the
apartment, I=m actually able to grab him by the back of
his jacket.  I grabbed his left arm....I=m forcing him to the ground.  He throws the dope on top of the bannister
and we get tackled to the ground.  And
then Officer McDonnold comes in after me.

 

                                                           *    *   
*

 

Q: So what happened at
this point?  You said you went to the
bedroom, bathroom to check for anybody else in there.

 

A: Correct.... I point at
the table, tell Officer Bricker - - because that=s a small table here.  There was
a - - some - - the baggies, paraphernalia and the gun was sitting on top of
the small table.  I yell at him to grab
the gun.  He grabs the gun.  (Emphasis added)

 

Officer Mata also identified the crack cocaine which Officer Mata put
into his pocket until Officer Carroll arrived. 
Officer Mata watched the field test which showed Apositive for cocaine.@ 
Officer Mata also identified the Taurus semiautomatic .380 caliber
handgun which was on the counter with the drugs and other paraphernalia.  Officer Mata testified that, after talking
to the female who was in the apartment, he released her.  Officer Mata said that he got into the squad
car with appellant and that, as he was filling out the Abook-in sheet,@ appellant asked him a question. 
At this point, appellant=s lawyer objected to Aany statement@ that
appellant made while he was in custody. 
Relevant portions of Officer Mata=s testimony read as shown:

Q: Was - - was the
statement he made to you, was that in response to a question, or did he just
start talking?

 

A: No, he asked me a
question.

 

                                                           *    *   
*           

 

Q: Okay.  What was that question?








A: Like I said, I was
filling out the book-in sheet.  The
book-in sheet is vital information where you put your charges that the person
is arrested for.  He asked me what he
was being charged with.  I said
possession of crack cocaine.  He said, AWell, I=m not - - I=m not
charged for that gun.@  And I said AI don=t know.@  He goes, AWell, the gun=s not mine. 
I knew it was in the apartment, but the gun=s not mine.  At that time, I charged him
with the gun.

 

Q: Why did you decide,
based on that statement, to charge him with the gun?

 

A: Because once we did -
- well, actually not at that exact time. 
I did a [computer check] to see if he had any prior felony
convictions.  Upon learning that he did
have a prior felony conviction, I charged him with possession of firearm.  A person who is - - has prior felony convictions
is not allowed to be in possession of a firearm on his person [even in his
residence within five years after release from confinement or
supervision].  After the statement that
he made knowing that it was in the residence that I believed was his, then I
charged him with UPF, which is unlawful possession of a firearm by a
felon.  (Emphasis added)

 

Officer Mata then testified that the weapon was a useable, working
firearm and that it was loaded  with ten
live rounds.  During cross-examination
by appellant=s attorney, Officer Mata said that he did not
know who was the Alegal
owner@ of the apartment where the gun was found and
that he did not see any lease agreement. 
When appellant=s
attorney asked if there was Aany other basis for his arrest,@ other than the fact that appellant said that he knew the gun was in
the apartment, Officer Mata answered: ABecause the girlfriend that was in there said it was his apartment.@ 
Officer Mata agreed with appellant=s lawyer that the officer would not have charged appellant with
possession of the gun Aprior
to his admission@ that he knew the gun was in the
apartment.  Officer Mata testified that
he did not charge the Agirlfriend@ because he did not believe that she was a
resident of the apartment where the gun and drugs were found.  She had another address which Officer Mata
verified.  On redirect examination,
Officer Mata testified that appellant did not knock on the door before he went
into the apartment; he just Aturned the knob and ran in.@  Appellant passed five other
apartments before he went into the apartment where the Agirlfriend@ was waiting.         The third witness, Anne Weaver, testified
that she is a senior forensic chemist in the drug analysis section of the
Southwest Institute of Forensic Sciences. 
She testified that the material found at the time of appellant=s arrest was cocaine and that the total
weight of the material was 14.6 grams.  








The State=s final witness, Officer Anthony Gipson of
the Dallas Police Department, testified as an expert witness about the effect
of cocaine on a person; he also said that 14 grams of cocaine would Agive you about 140 uses.@  
Officer Gipson expressed the opinion that Athat=s a lot of uses for one person to be
possessing at one time unless they=re planning to sell them.@  Officer Gipson also testified
that the Astreet value@ of a tenth of a gram of cocaine was $10 and that the Astreet value of 14.6 grams@ would be about $1,460.  Officer Gipson said that it was his opinion
that this amount of cocaine was Apossessed with intent to deliver, not for personal use.@

After the
State rested, there were two witnesses who were called by appellant=s attorney. 
The first witness was Lily Anderson. 
She testified that appellant was her Afiancé@ and that she was with him on September 5 at
the time of his arrest.  Anderson
testified that the two of them went to the apartment complex to check on
appellant=s grandfather, that the grandfather lived on
the ground floor of that apartment complex, and that they went upstairs to get
him some beer.  Anderson testified that
appellant did not live in the apartment where he was arrested.  She did not know who lived there, but she
said that a man and woman were there. 
They went to get beer for appellant=s grandfather.  She waited in
the apartment while appellant went downstairs to tell his grandfather that Athey had to go get the beer.@ 
Anderson said that appellant came back to the upstairs apartment, that
he locked the door, and that the Apolice busted the door open.@  Anderson testified that
appellant did not have any drugs and that the police Anever asked@ her for any information. 
Anderson also testified that she never told the police that appellant
lived in the apartment where he was arrested. 
Anderson testified that she did not see Aa weapon@ and that she did not see any drugs in the
apartment.  








Appellant
was the next witness, and he testified to the same version of events as given
by Anderson.  Appellant specifically
denied that he had ever lived in the apartment where he was arrested.  Appellant said that he went to the apartment
because his grandfather had sent him there because Athat=s where the bootleg was.@  The people who were there told
appellant that they would have to go to get the beer, and they asked them to
watch the apartment.  Appellant said
that Anderson waited in the apartment while he went downstairs to tell his
grandfather the reason for the delay and that, when he went back upstairs to
the apartment where his Awife@ was waiting, he locked the door.  Appellant testified Athat=s when the laws came, just kicked down the door,@ grabbed him, and threw him down.  Appellant testified that he did not have any
drugs, that he did not see any drugs in the apartment, and that he did not know
there was a gun in the apartment. 
Appellant denied the claim that he told the officer that he knew the gun
was in the apartment.  During
cross-examination, appellant said that he was not a Adrug dealer.@  He did admit to two felony
convictions in 1995 for possession of marihuana and another conviction in 1998
for possession of cocaine Awith intent to deliver.@  Appellant testified that he
was 23 years old and that he had all of his money with him because he Adon=t trust nobody else@ with his money.  Appellant
claimed that the police planted the marihuana and crack on him and that the
police were lying about what had happened. 


After
appellant=s attorney rested, the State recalled the
first two police officers who had testified. 
Officer Mata testified that they did not kick in the door of the
apartment and that he saw the bag in appellant=s hand.  Officer McDonnold
testified that the door was not kicked in and that he saw Officer Mata and
appellant go into the apartment Aat the same time.@  

                                                       Warrantless
Arrest and Search                 

First, we
note that, if the testimony of appellant and Anderson is believed, appellant
would not have had a Areasonable
expectation of privacy@ in
the apartment; therefore, he would not have had standing to complain of the
warrantless search of the apartment. 
See, e.g., Minnesota v. Carter, 525 U.S. 83, 90 (1998).  

Assuming
that appellant had standing to complain of the warrantless search of the
apartment, we note that both the U.S. CONST. amend. IV and the TEX. CONST. art.
I, ' 9 protect the citizens of this nation and of
this State from Aunreasonable@ searches and seizures. See and compare Johnson v. State, 912 S.W.2d
227, 232, 235-36 (Tex.Cr.App.1995). 
Police officers are permitted to approach a citizen in order to ask
questions or even to request a consent to search.  Terry v. Ohio, 392 U.S. 1, 31 (1968).  Appellant=s act in running from the uniformed police officers who were on foot
patrol in a Ahigh crime area@ was sufficient to justify a ATerry@
stop.  See and compare Illinois v.
Wardlow, 528 U.S. 119, 123 (2000); Rhodes v. State, 945 S.W.2d 115, 117
(Tex.Cr.App.1997), cert. den=d, 522 U.S. 894 (1997).








When he
saw the contraband in appellant=s hand, Officer Mata was authorized to make a warrantless arrest under
TEX. CODE CRIM. PRO. ANN. arts. 14.01(b) & 14.03 (Vernon 1977 & Supp.
2002).    In reviewing the trial court=s rulings on motions to suppress evidence, an
appellate court will review the Atrial court=s
determination of historical facts@ by looking at the evidence in a Alight most favorable to the trial court=s ruling.@  Carmouche v. State, 10 S.W.3d 323, 327-28
(Tex.Cr.App.2000).  Issues Nos. I, II,
and III are overruled.

                                                          Appellant=s Oral Statement

The
evidence quoted above from Officer Mata=s testimony supports the trial court=s ruling that appellant=s inculpatory statement about the gun was not the product of custodial
interrogation.  See Carmouche v. State,
supra.  Consequently, there is no
violation of either Miranda v. Arizona, 384 U.S. 436, 444 (1966), or of TEX.
CODE CRIM. PRO. ANN. art. 38.22 (Vernon 1979 & Supp. 2002).  Issue No. IV is overruled.

                                                              Possession
of Firearm

Appellant
argues in Issue No. V that Athe evidence was insufficient@ to prove that he Apossessed the firearm.@  Jackson v. Virginia, 443 U.S.
307, 319 (1979), and Whitaker v. State, 977 S.W.2d 595, 598 (Tex.Cr.App.1998),
state the test which is used to determine the sufficiency of the evidence.  That test requires an appellate court to
consider all of the evidence in the light most favorable to the jury=s verdict and to affirm the conviction if Aany rational fact finder could have found
beyond a reasonable doubt@ those elements of the offense which are challenged by the appeal.  Jackson v. Virginia, supra at 319; Whitaker
v. State, supra at 598.  In order to
prove the unlawful possession of the firearm, the State can rely upon
circumstantial evidence to prove that appellant was in possession of the
firearm which was found in the apartment. 
See and compare Martinez v. State, 786 S.W.2d 82, 84 (Tex.App. - San
Antonio 1990, no pet=n).  The jury was free to reject the testimony of
appellant and Anderson.  The evidence
from Officer Mata shows that appellant went without knocking into the apartment
where Anderson  was waiting for him.[4]  The baggies in the apartment were identical
to the bagggies found upon appellant at the time of his arrest.  The money and the drugs found upon appellant
at the time of his arrest were circumstantial proof that he was selling
drugs.  The drugs, drug paraphernalia,
and the loaded gun in the apartment were together in plain view; guns are often
used to protect drugs and cash.   This
circumstantial evidence supports the jury=s finding that appellant was in possession of the gun.  Issue No. V is overruled.

 








                                                          Officer
Gipson=s Testimony

Appellant
argues in Issue No. VI that the trial court erred in overruling his objection
to Officer Gipson=s
testimony.  Officer Gipson had testified
that he was familiar with the controlled substance known as cocaine,
particularly crack cocaine.  The
reporter=s record shows the following questions,
answers, objections, and rulings:

Q:
Okay.  What kind of effects I guess does
it have on people?

 

A: Well,
the initial effect is an almost instantaneous euphoria after smoking.

 

[DEFENSE
COUNSEL]: Excuse me, sir.  Judge, I
would object.  Since Detective Gipson is
not a fact witness, we would object as to relevance.  Since he=s not
a fact witness, we would object as to relevance.

 

THE COURT:
I=m going to overrule you.

 

[DEFENSE
COUNSEL]: Thank you, sir.

 

A: I=m sorry. 
The - - after you smoke the piece of crack cocaine, initially, you get a
very euphoric feeling.  It=s a very addictive feeling because there=s no physical addiction associated with
cocaine.  It=s all psychological.  But the feeling is very pleasurable.

 

[DEFENSE
COUNSEL]: Excuse me, Detective Gipson. 
Judge, we would object as to his testimony with respect to the effects
of cocaine on a person unless the State qualifies him as an expert in this area.

 

THE COURT:
I=m going to overrule you, admit it.

 

[DEFENSE
COUNSEL]: Thank you, sir.

 

A: The
initial good feeling only lasts anywhere from about 25 minutes to an hour.  At that time, you=re still in - - after that amount of time,
you=re still impaired.  However, your desire to use more cocaine is probably going to
return after that amount of time.  And
that=s really the hook of crack cocaine is that
initial good feeling that lasts anywhere from about 25 minutes to an hour.

 








After that
discussion, Officer Gipson testified about the narcotics paraphernalia and how
the cocaine was cut and put into single dosage baggies.  He then gave his expert opinion that, Afrom the shear quantity alone,@ the cocaine was Apossessed with the intent to deliver.@ 
Officer Gipson said that, when the other factors were considered, Athe baggies, a scale, the cash,@ it bolstered his opinion that the cocaine
was Apossessed with intent to deliver, not for
personal use.@ 

TEX.R.EVID.
401 defines Arelevant evidence.@  TEX.R.EVID. 402 provides that relevant evidence is generally
admissible.  TEX.R.EVID. 403 provides
that relevant evidence Amay be excluded@ if its probative value is substantially outweighed by the danger of
unfair prejudice.  TEX.R.EVID. 404
provides that Acharacter evidence@ is not admissible to prove conduct.  These rules were discussed by the Court of
Criminal Appeals in Montgomery v. State, 810 S.W.2d 372, 391 (Tex.Cr.App.1991),
where the court makes it clear that appellate courts are to Auphold the trial court=s ruling@ on evidentiary objections unless there is an Aabuse of discretion.@  This
testimony was relevant to show Officer Gipson=s knowledge and experience as an expert witness.  Appellant has not shown an abuse of
discretion by the trial court.  Issue
No. VI is overruled.

                                                 Deadly
Weapon Finding in Drug Case

Appellant
argues in Issue No. VII  that the trial
court Aerred in entering a deadly weapon finding@ in the drug case.  There is circumstantial evidence to support the jury=s finding that the deadly weapon was used to
protect the money and the large quantity of cocaine which appellant possessed Awith intent to deliver.@ See and compare: McCain v. State, 22 S.W.3d
497, 502-03 (Tex.Cr.App. 2000); Gale v. State, 998 S.W.2d 221, 225
(Tex.Cr.App.1999); Patterson v. State, 769 S.W.2d 938, 942
(Tex.Cr.App.1989).  Issue No. VII is
overruled.

                                                                This
Court=s Ruling

The
judgments of the trial court are affirmed.

 

BOB
DICKENSON

SENIOR
JUSTICE

June 27, 2002

Do not publish.  See TEX.R.APP.P. 47.3(b).

Panel consists of: Arnot, C.J., and

McCall, J., and Dickenson, S.J.[5]











[1]Appellant entered a plea of Atrue@ to the
enhancement allegation in both indictments.





[2]Cause No. F00-53253-WSW in the 363rd District Court of
Dallas County and No. 11-01-00115-CR in this court.





[3]Cause No. F00-53254-WSW in the 363rd District Court of
Dallas County and No. 11-01-00114-CR in this court.





[4]Anderson was either appellant=s Awife@ (his
testimony), his Agirlfriend@
(Officer Mata=s testimony), or his Afiancé@ (her testimony).





[5]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.